SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-04-0073-AP |
| Appellee, | ) |
| | ) Mohave County |
| v. | ) Superior Court |
| | ) No. CR-99-0187 |
| CHARLES DAVID ELLISON, | ) |
| | ) |
| Appellant. | ) |
| | ) |
| | ) |
| _____ ) | **O P I N I O N** |

Appeal from the Superior Court in Mohave County
The Honorable Robert R. Moon, Judge

**AFFIRMED**

_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
      By   Kent E. Cattani, Chief Counsel
           Capital Litigation Section
           Jon G. Anderson, Assistant Attorney General
Attorneys for the State of Arizona

DAVID GOLDBERG                                             Flagstaff
Attorney for Charles David Ellison

_____

**B A L E S**, Justice

¶1        On January 18, 2002, Charles David Ellison ("Ellison") was convicted after a jury trial in Mohave County Superior Court of two counts of first degree murder and one count of first degree burglary.  In February 2004, after sentencing proceedings before a separate jury, the superior court sentenced him to death for each murder.  The trial judge also sentenced him to a

concurrent sentence of twelve-and-one-half years for the burglary conviction. This is a mandatory appeal under Arizona Rule of Criminal Procedure 31.2(b). This court has jurisdiction under Article 6, Section 5(3), of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13-4031 (1999).

## I. Factual and procedural background[1]

¶2    On the morning of February 26, 1999, police went to the home of Joseph and Lillian Boucher after their daughter, Vivian Brown, could not contact her parents. When no one answered the door, police entered the home through the kitchen, where they noticed a telephone with its line cut and cord missing and a knife block with a missing knife.

¶3    Police discovered the body of Joseph Boucher on a bed in a bedroom. He had defensive wounds and minor cuts and scrapes on his wrists and arms indicating he had been bound. In another bedroom, police found Lillian Boucher's body on the floor. She had bruises on her face and body, consistent with an altercation, and a small amount of blood around her nose. According to the medical examiner, Mr. Boucher had been asphyxiated by smothering. Mrs. Boucher had been asphyxiated by smothering or a combination of smothering and strangulation.

---

[1] We view the facts in the light most favorable to sustaining the jury's verdicts. *State v. Tucker*, 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003).

2

Missing from the house were a .22 caliber handgun, a pellet gun, Mr. Boucher's wedding ring and watch, and Mrs. Boucher's diamond wedding ring, anniversary ring, watch, earrings, and crucifix.

¶4    On February 26, 1999, Brad Howe contacted police with information that he had obtained from Richard Finch about the murders.  Finch worked for Howe and his father as a "lot boy" at their auto dealership in Lake Havasu City and also lived at Howe's house.  According to Howe, Finch was "simple" and, because he could not manage his own finances, Howe and his father gave Finch money only as he needed it.

¶5    Howe did not see Finch on the night of February 24; however, they went drinking at several bars the next night. Howe offered to pay as usual, but Finch surprised him by offering to buy drinks and displaying $250 to $300.  Howe told police that Finch was drinking heavily and acting as if something was on his mind.  Howe repeatedly asked Finch what was distracting him.  Finch became "very upset" and admitted he had been involved in "some bad things."  The two then left the bar and, on the way home, Finch told Howe more details.

¶6    Once at home, Finch, upset and crying, retrieved a bag and showed Howe the contents.  Howe, not wanting the items in his house, took the bag and hid it in the desert in the early morning hours of February 26.  He later led police to the bag, which contained several items stolen from the Bouchers' home.

3

¶7     The same day, police officers went to Howe's house and arrested Finch, who had packed his belongings as if planning to leave. After being advised of his *Miranda* rights, Finch agreed to speak with police. In a taped interview, Finch confessed his involvement in the murders. He also identified his companion as "Slinger," a nickname used by Ellison. Two days later, Finch helped police find the missing kitchen knife in a field behind the Bouchers' house.

¶8     On March 1, 1999, after unsuccessfully searching for Ellison at the house of his girlfriend, Cathie Webster-Hauver, Kingman detectives Steven Auld and Lyman Watson learned that Ellison had been arrested in Lake Havasu. After informing Ellison of his *Miranda* rights, the detectives interviewed him at the Lake Havasu police station just before 9:00 a.m. Ellison told the detectives he had met Finch two or three weeks earlier at Darby's, a Lake Havasu bar. The two men met again at Darby's on February 24, 1999, where Ellison agreed to do "a job" with Finch in Kingman. Ellison said that he intended only to commit a burglary, not to kill anyone. Ellison also denied killing either victim.

¶9     That same night, Ellison and Finch drove Ellison's van to Kingman, where they stopped at the Sundowner's Bar. According to the bartender, Jeannette Avila, Ellison entered the bar first, ordered and paid for beers, talked to her at length,

and led the way when the two men left the bar. Finch, in contrast, never spoke to Avila; he simply sat without removing his sunglasses. Avila later identified Ellison in a photographic line-up, but was unable to identify Finch.

¶10     Ellison said they next drove to a nearby movie theater and parked the van. Finch led the way to the Bouchers' house and entered first. Once inside, Ellison and Finch ordered Mrs. Boucher from the living room and into Mr. Boucher's bedroom. Ellison admitted binding the victims with the phone cords and masking tape, but claimed to have done so only at Finch's direction. Ellison said Finch then pointed a gun at him and ordered him to kill Mr. Boucher. By his account, Ellison held a pillow over Mr. Boucher's face for a period of time, possibly only a few seconds, while Finch strangled Mrs. Boucher. Ellison said he removed the pillow when Mr. Boucher stopped struggling, but claimed he thought Mr. Boucher was still alive because his chest was moving up and down. Ellison said he told Finch he would have to finish off Mr. Boucher. Ellison also said that after Finch strangled Mrs. Boucher, Finch moved her body to another bedroom.

¶11     Ellison claimed that it was Finch's idea to "hit" the house and that he did not know how Finch had picked the Bouchers' home. Ellison admitted he was somewhat familiar with the area because his parents lived nearby. Additionally, at

5

trial, Brown identified Ellison as having worked on her parents' home in October 1997 and at a nearby house the next year. According to Howe, Finch did not possess a gun or a vehicle and had never gone to Kingman before February 24, 1999.

¶12     The police acknowledged at trial that no physical evidence proved who actually killed either victim. None of the approximately 170 fingerprints found in the house matched Ellison or Finch. Police found a latex glove in the Bouchers' yard. Ellison later admitted he had supplied the latex gloves that he and Finch wore during the burglary and murders. None of the Bouchers' property was found on Ellison, in his van, or at his girlfriend's home. Ellison, however, was not arrested until five days after the murders. Ellison admitted removing jewelry from Mrs. Boucher's body, but said he did so only at Finch's direction. He also admitted using twenty dollars stolen from the Bouchers to buy gas for his van.

¶13     The detectives attempted to record their initial interview with Ellison but failed to do so.[2] Detective Watson re-interviewed Ellison at 10:06 a.m. In this nine-minute recorded interview, Detective Watson tried to summarize the main

---

[2] Ellison has not raised any issue regarding the detectives' failure to successfully record his initial interview.

points of the first interview. This tape was played for the guilt proceeding jury.

¶14     On March 4, 1999, Ellison and Finch were indicted for the murders and first degree burglary. The State sought the death penalty for each defendant. Judge Robert R. Moon severed their trials. In September 2000, a jury convicted Finch on the murder and burglary charges. In March 2001, Judge Moon sentenced Finch to natural life imprisonment, finding, among other things, mitigating factors due to Finch's having acted under duress from Ellison and later cooperating with police in the investigation.

¶15     Ellison was tried in January 2002. With Judge Moon presiding, the jury convicted Ellison on the murder and burglary charges, specifically finding him guilty of both premeditated and felony murder of the Bouchers and that he had either killed, intended to kill, or acted with reckless indifference.

¶16     Before Ellison was sentenced, the United States Supreme Court decided *Ring v. Arizona* (*Ring II*), 536 U.S. 584 (2002). The legislature then amended Arizona's statutes to provide for jury findings of aggravating and mitigating circumstances and jury sentencing. A.R.S. § 13-703.01 (Supp. 2003). A newly impaneled jury heard Ellison's sentencing proceeding in January and February, 2004. This jury determined that death was the appropriate sentence for each murder, after

7

finding six aggravators: 1) previous serious felony conviction; 2) pecuniary gain; 3) especially cruel; 4) murder committed while on parole; 5) multiple homicides; and 6) victims more than seventy years old.

## II. Issues relating to the convictions

### A. Ellison's confession

#### 1. Facts

¶17     Ellison moved before trial to suppress his statements to the police, arguing that they were involuntary and obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). At a voluntariness hearing, Detective Watson testified that, after he gave *Miranda* warnings and Ellison agreed to talk, the detectives began by telling Ellison information they had about his activities in Kingman on February 24; Ellison did not respond. Detective Auld said that "he did not believe [Ellison] was a bad guy." Detective Watson said that they did not believe Ellison meant for anyone to die.

¶18     According to both detectives, Ellison sat back and said: "Die? I don't know what you're talking about," and "I *think* I *might* want a lawyer." (Emphasis added.) They then stopped their questioning and told him that they could not talk with him until he was clear whether he wanted an attorney. The detectives said they attempted to get a clear answer from Ellison. During this questioning, they also told him that they

had "a mountain of physical evidence and only one side of the story" from Finch.

¶19    After a while, Detective Auld said: "Okay. That's it, then," and left. He testified that he left because he was unsure whether Ellison wanted an attorney. According to Detective Watson, who stayed in the room, Ellison still had not given a clear answer. At this point, Ellison asked what he was being charged with. Detective Watson responded, "two counts of first degree murder." Ellison appeared upset and asked: "Can't we just forget about the lawyer thing?" Detective Watson replied: "No. If I'm not going to lie to you, I'm not going to lie to a judge. We can't just forget about the lawyer thing." He told Ellison he "need[ed] to be very clear." Ellison said, "I will talk to you" and told Detective Watson that he did not want an attorney. Detective Watson called Detective Auld back into the room and Ellison told Auld the same thing.

¶20    Ellison talked to the detectives and, just before returning to his jail cell, offered to testify against Finch. According to Detective Watson, testifying against Finch was Ellison's idea. Detective Watson told Ellison he would relay his offer to the county attorney. Watson, however, denied making any promises of leniency or reduced charges.

¶21    During the subsequent taped interview, a transcript of which was admitted at the voluntariness hearing, Detective Watson asked Ellison:

> I advised you of your rights before we talked right? During the interview you said you wanted an attorney then you said no I will talk to you.  You made it real clear to Steve and I that you would talk to us is that correct?  That's a yes if you're nodding your head[.]

Ellison replied: "Yeah."

Also in the taped interview, Detective Watson told Ellison:

> *Remember the deal*, I'm not lying to you, I'm not going to bullshit you.  That's what got this whole thing started. . . .  The reason I've come back down here is I want to make sure it's clear and there's no mistakes.  And when I talk to the county attorney and you said you'd testify, I want to have what you were saying real clear about the fact that this was Richard [Finch]'s idea.

(Emphasis added.)  Detective Watson testified that the "deal" did not refer to leniency.  He stated that "deal" referred to statements he made in the first interview about not lying or playing games.  Additionally, as best he could recall, he referred to the county attorney only to explain why he was taping a second interview.

¶22    Ellison also testified at the voluntariness hearing with a very different account of events.  According to Ellison, after the detectives informed him of his *Miranda* rights and asked about the killings, he "freaked out" and said, "I *want* a lawyer."  (Emphasis added.)  He said, despite this request, the

10

detectives switched between asking him if he wanted a lawyer and asking him questions about the crime until Detective Auld got mad and left. At this point, Ellison believed the interview was over because he had asked for an attorney. He said Detective Watson then told him that, if he testified against Finch, they would get the county attorney to reduce his charges to burglary.

¶23    Ellison testified that he would not have talked to the police without their promises of leniency. He said that he did not make any specific statements about reduced charges or leniency during the taped interview because he "thought it was clear what was going on." Ellison denied that testifying against Finch was his idea.

¶24    Judge Moon found that the officers complied with *Miranda* and denied the motion to suppress. The judge found the detectives to be more credible than Ellison, and determined that Ellison made an equivocal request for an attorney, which the detectives properly attempted to clarify. Finally, he found the police did not promise leniency and that Ellison did not rely on any promises in making his statements.

## 2. Right to counsel

¶25    A trial court's decision to admit a defendant's statement is reviewed for an abuse of discretion, *State v. Jones*, 203 Ariz. 1, 5 ¶ 8, 49 P.3d 273, 277 (2002), based on the evidence presented at the suppression hearing, *State v. Hyde*,

11

186 Ariz. 252, 265, 921 P.2d 655, 668 (1996). The evidence is viewed in the light most favorable to upholding the trial court's ruling. *Hyde*, 186 Ariz. at 265, 921 P.2d at 668.

¶26    Under the Fifth and Fourteenth Amendments, a suspect has a right against self-incrimination, which includes the right to counsel during a custodial interrogation. *Miranda*, 384 U.S. at 478-79. If a suspect requests counsel, "the interrogation must cease until an attorney is present." *Id.* at 474. However, "law enforcement officers may continue questioning until and unless the suspect *clearly* requests an attorney." *Davis v. United States*, 512 U.S. 452, 461 (1994) (emphasis added). Not every reference to an attorney must be construed by police as an invocation of the suspect's right to counsel. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, . . . precedents do not require the cessation of questioning." *Id.* at 459.

¶27    The only evidence regarding Ellison's reference to a lawyer is the conflicting testimony of Ellison and the detectives. Judge Moon, who was able to assess the witnesses during the voluntariness hearing, determined that the officers' account was more credible. Considering the evidence in the light most favorable to upholding Judge Moon's ruling, *Hyde*, 186

12

Ariz. at 265, 921 P.2d at 668, we assume Ellison said: "I think I might want an attorney."

¶28　　　　In *Davis*, the Court held that a suspect's statements, "[m]aybe I should talk to a lawyer" and "I think I want a lawyer before I say anything else," were equivocal requests for counsel. 512 U.S. at 455. The equivocal statements did not articulate the request clearly enough for a reasonable police officer to understand. Thus, the police were not required to stop questioning. *Id.* at 461-62; *accord State v. Eastlack*, 180 Ariz. 243, 250-51, 883 P.2d 999, 1006-07 (1994) (finding the statement "I think I better talk to a lawyer first" was an equivocal request for an attorney).

¶29　　　　Like the statements at issue in *Davis* and *Eastlack*, Ellison's statement, "I think I might want an attorney," was an equivocal request for counsel. Thus, the detectives were not required to stop questioning him.[3] Ellison argues that, even if

---

[3] Although police officers are not required to stop questioning when the defendant makes an equivocal request for counsel, "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Davis*, 512 U.S. at 461. As Justice O'Connor noted in *Davis*, such a practice not only protects the rights of the suspect, but will also "minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." *Id.; see also State v. Newell*, 212 Ariz. 389, 408 ¶ 33, 132 P.3d 833, 842 (2006) (noting that it was "entirely appropriate" to first clarify whether a suspect was requesting counsel and then to proceed with questioning after learning that he was not).

his statement was equivocal, the detectives could not question him except to clarify his request for counsel. Ellison, however, fails to recognize that *Davis* and *Eastlack* expressly determined that, if a defendant makes an ambiguous statement, police are *not* constitutionally required either to clarify the statement or to stop their questioning. Ellison's ambiguous statements do not meet the "threshold standard of clarity . . . [which] invoke[s] the right to counsel." *Eastlack*, 180 Ariz. at 250, 883 P.2d at 1006 (citing *Davis*, 512 U.S. at 454-56). The police's "subsequent questioning [of Ellison] was thus proper." *Id.*

### 3. Voluntariness

¶30     To be admissible, a statement must be voluntary, not obtained by coercion or improper inducement. *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963). "Promises of benefits or leniency, whether direct or implied, even if only slight in value, are impermissibly coercive." *State v. Lopez*, 174 Ariz. 131, 138, 847 P.2d 1078, 1085 (1992). This is a separate inquiry from the right to counsel under *Miranda*.

---

We also again observe that videotaping "the *entire* interrogation process" is both good police practice and a profound aid to courts assessing *Miranda* claims. *Newell*, 212 Ariz. at 408 n.9, 132 P.3d at 842 n.9 (quoting *Jones*, 203 Ariz. at 7 ¶ 18, 49 P.3d at 279).

14

¶**31**     In Arizona, a suspect's statement is presumptively involuntary. *State v. Amaya-Ruiz*, 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990). However, "[a] prima facie case for admission of a confession is made when the officer testifies that the confession was obtained without threat, coercion or promises of immunity or a lesser penalty." *State v. Jerousek*, 121 Ariz. 420, 424, 590 P.2d 1366, 1370 (1979). Here, the detectives testified that they never asked Ellison to testify against Finch and never suggested any charges would be dropped if he testified; nor did they threaten or otherwise intimidate him.

¶**32**     The trial court generally is responsible for resolving conflicts of testimony and this court will defer to those findings absent an abuse of discretion. *State v. Lacy*, 187 Ariz. 340, 347, 929 P.2d 1288, 1295 (1996) (citing *Jerousek*, 121 Ariz. at 424, 590 P.2d at 1370). Ellison argues his confession was involuntary because it was induced by promises of leniency. Ellison's arguments presume the truth of his version of events, despite contrary testimony by the detectives.

¶**33**     Judge Moon, however, concluded that Detective Watson's testimony was more credible and determined the evidence did not show any express or implied promises of leniency. Moreover, it does not appear that Ellison's will was overborne by any promises of leniency. *See State v. Tapia*, 159 Ariz. 284, 287-88, 767 P.2d 5, 8-9 (1988). Although he agreed to talk with the

15

detectives, he maintained that Finch was the ringleader and that he acted only under duress. Ellison also admitted being familiar with, and understanding, his *Miranda* rights. There is no basis here to conclude that Judge Moon abused his discretion in determining that Ellison's statements were voluntary.

## B. Trial judge's bias or prejudice

¶34     During a pre-trial status hearing, after reading newspaper accounts of statements made by Judge Moon during Finch's sentencing, Ellison's counsel asked if Judge Moon was biased. Judge Moon stated that he had made findings specific to the evidence at Finch's trial, not due to any bias against Ellison, but invited counsel to file a motion under Arizona Rule of Criminal Procedure 10.1.[4] Defense counsel failed to make such a motion.

¶35     The constitutional right to a fair trial includes the right to a fair and impartial judge. *State v. Mincey*, 141 Ariz.

---

[4] Evidence was produced at Finch's trial, including Finch's statements to police, that was not admitted in Ellison's trial. According to Finch, it was Ellison's idea to burglarize the Bouchers' home. Finch claimed he only intended to commit a burglary, not to kill anyone, and that he killed Mrs. Boucher only to avoid being killed himself. Finch presented evidence of his duress as a statutory mitigator, A.R.S. § 13-703(G)(2), which the trial judge determined Finch had proven by a preponderance of the evidence. The judge also found mitigating evidence in the fact that Finch was unusually susceptible to the influence of others and had cooperated with police during the investigation.

425, 442, 687 P.2d 1180, 1197 (1984). Under Rule 10.1(a), a defendant is entitled to a new judge "if a fair and impartial hearing or trial cannot be had by reason of the interest or prejudice of the assigned judge." To exercise this right, the defendant must request the change of judge within ten days of discovering the grounds for cause. Ariz. R. Crim. P. 10.1(b).

¶36 Ellison's failure to file a Rule 10.1 motion is itself a basis to reject his argument that the judge was improperly biased. The rule specifically provides that an untimely removal motion may be denied regardless of its merits. *See id.; accord Mincey*, 141 Ariz. at 443, 687 P.2d at 1198. In any event, Ellison has not identified facts showing that Judge Moon was required to remove himself from the case.

¶37 "Judges are presumed to be impartial, and the party moving for change of judge must prove a judge's bias or prejudice by a preponderance of the evidence." *State v. Smith*, 203 Ariz. 75, 79 ¶ 13, 50 P.3d 825, 829 (2002) (finding capital murder defendant, who failed to provide evidence of actual bias, did not meet his burden of proof under Rule 10.1). Otherwise, Rule 10.1 "procedures would be rendered meaningless and effectively circumvented if permission to question a judge's partiality rested not on concrete facts and specific allegations but on mere speculation, suspicion, apprehension, or

17

imagination." *State v. Rossi*, 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987).[5]

¶38        "[T]here is no *per se* disqualification of a sentencing trial judge who presides over a codefendant's trial." *State v. Greenway*, 170 Ariz. 155, 162, 823 P.2d 22, 29 (1991). There also is no bias or prejudice inherent in presiding over a defendant's subsequent proceeding, even though the judge has heard unfavorable remarks about the defendant in prior proceedings, particularly when the judge states he will keep an open mind. *State v. Thompson*, 150 Ariz. 554, 557-58, 724 P.2d 1223, 1226-27 (App. 1986). "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make

---

[5] Independent of Rule 10.1, under the Judicial Code of Conduct, a judge ethically must avoid impropriety and the appearance of impropriety. Ariz. R. Sup. Ct. 81, Canon 2(A), cmt. A judge must disqualify himself if his "impartiality might reasonably be questioned" for reasons such as "personal knowledge of disputed evidentiary facts" or "personal bias or prejudice." *Id.* Canon 3(E)(1)(a). Ellison has not, however, relied on the Code of Judicial Conduct in arguing for Judge Moon's disqualification. Still, we note that, as a matter of ethics, a judge presiding over a codefendant's trial does not automatically raise a reasonable question of impartiality. *State v. Thompson*, 150 Ariz. 554, 556-57, 724 P.2d 1223, 1225-26 (App. 1986) (citing Canon 3). Here, Judge Moon's statements do not suggest that his impartiality could reasonably be questioned as an ethical matter.

18

fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *accord State v. Henry*, 189 Ariz. 542, 546, 944 P.2d 57, 61 (1997).

¶39        Ellison argues that the sentencing of Finch reflects that Judge Moon was biased against Ellison.  Judge Moon, however, emphasized that his decisions in Finch's case were based on the evidence presented at that trial.  He also promised to make his decisions in Ellison's case based solely on the evidence produced during Ellison's trial.  Judge Moon's statements accord with *Greenway*, *Thompson*, and *Liteky*.

¶40        Ellison also argues that Judge Moon made several evidentiary rulings against him.  However, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," *Liteky*, 510 U.S. at 555, without showing "[]either an extrajudicial source of bias []or any deep-seated favoritism," *State v. Schackart*, 190 Ariz. 238, 257, 947 P.2d 315, 334 (1997).  As explained in this opinion, *infra* ¶¶ 43-59, Judge Moon did not err in any of the challenged evidentiary rulings.  Additionally, he ruled in Ellison's favor to exclude several hearsay statements.  Ellison has failed to show bias or prejudice that would require Judge Moon's disqualification under Rule 10.1.

## C. Selection of a death qualified jury

¶41     Ellison argues that his guilt proceeding jury was unconstitutionally relieved of the gravity of its decision because potential jurors were told, in a questionnaire and instructions, they would have no role in determining punishment and should not consider the likely punishment.  Under *Caldwell v. Mississippi*, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  472 U.S. 320, 328-29 (1985).  Ellison's argument fails, however, because, when his jury was selected, juries were *not* responsible for deciding whether a death sentence is appropriate. *State v. Anderson* (*Anderson II*), 210 Ariz. 327, 337 ¶ 23, 111 P.3d 369, 378 (2005) (rejecting identical argument).

## D. Evidentiary issues

¶42     Ellison challenges various evidentiary rulings by the trial court.  Such rulings generally are reviewed for an abuse of discretion.  *See State v. Tucker*, 205 Ariz. 157, 165 ¶ 41, 68 P.3d 110, 118 (2003).  Evidentiary rulings that implicate the Confrontation Clause, however, are reviewed de novo.  *Lilly v. Virginia*, 527 U.S. 116, 137 (1999).

## 1. Admissibility of Finch's statements to Brad Howe

¶43    Before trial, Ellison asked the trial court to rule on the admissibility of certain statements Finch made to Howe after the murders.  At an evidentiary hearing, Howe testified that Finch and he went barhopping the night after the murders.[6]  While at Red's Bar, Finch said that *he* (Finch) had killed two people the night before.  Howe promptly removed Finch from the bar and drove home.

¶44    On the way home, Finch told Howe that he had gone with "Slinger" (Ellison) to rob some people.  According to Howe, Finch said that he thought he was going to watch Ellison's back.  Ellison drove the two in his van.  Finch did not know the name of the town to which Ellison drove them.  Finch told Howe that Ellison represented himself as an Aryan Brotherhood "enforcer."  According to Howe, Finch believed they were going to threaten or scare somebody, not to kill anyone.  Finch said that Ellison, unable to kill Mr. Boucher, ordered him to do so.  When Finch refused, Ellison pointed a gun at him and threatened him.  Finch told Howe that he was "scared to death of Slinger."  He also told Howe that he was looking into the victims' eyes when they died.

---

[6] Howe did not testify at trial about the statements at issue and the jury did not otherwise hear this information.

21

¶**45**    Defense counsel moved to introduce Finch's statements at Red's Bar as statements against interest, Ariz. R. Evid. 804(b)(3), and to exclude Finch's statements made to Howe after they had left Red's Bar. The trial judge ruled that Finch's statements at Red's Bar were admissible as statements against interest. The judge also ruled that, while the State could not call Howe to the stand to specifically elicit testimony about the statements that Finch made on the way home, it could cross-examine Howe with those statements for impeachment purposes, absent a prejudice issue under Arizona Rule of Evidence 403. In light of these rulings, defense counsel did not elicit testimony from Howe regarding any of Finch's specific statements made either at Red's Bar or on the way home.[7] Ellison now argues the trial court should have ruled Finch's other statements inadmissible, even for impeachment purposes, under the Confrontation Clause.[8]

---

[7] Ellison did not seek to admit any of these statements during his sentencing proceeding.

[8] Because Judge Moon limited admissibility of Finch's statements to Howe after they left Red's Bar to impeachment purposes, defense counsel's choice not to elicit any testimony regarding Finch's statements at Red's Bar effectively barred the State from introducing Finch's statements made on the way home. There is an argument that defense counsel, by choosing not to question Howe regarding Finch's statements, waived any Confrontation Clause challenge to Judge Moon's ruling. *Cf. State v. Smyers*, 207 Ariz. 314, 316-18 ¶¶ 5-15, 86 P.3d 370, 372-74 (2004) (holding, based on long-standing case law, that defendant who did not testify at trial waived any challenge to a pretrial

22

¶46 This court, however, recently ruled that, when a defendant seeks to admit portions of his accomplice's recorded statements, the trial judge may, under Arizona Rule of Evidence 106, admit the remaining statements *if* necessary to avoid confusing the jury. In that event, the Confrontation Clause is not even implicated. *State v. Prasertphong* (*Prasertphong II*), 210 Ariz. 496, 499-500 ¶¶ 13-17, 114 P.3d 828, 831-32 (2005) (citing *State v. Soto-Fong*, 187 Ariz. 186, 194, 928 P.2d 610, 618 (1996) (determining that "once [Soto-Fong] made the tactical decision to introduce some of [the informant's] testimony about [the conversation with the two alleged accomplices], he could not simultaneously preclude the state from introducing other evidence of that same conversation") (alterations in original)).

¶47 *Prasertphong II* demonstrates that if Ellison had introduced Finch's statements to Howe while at Red's Bar, he could not then claim a Confrontation Clause violation if the prosecution introduced Finch's other statements made during their continued conversation on the way home from the bar.

_____

ruling allowing use of prior felony convictions for impeachment purposes); *State v. Conner*, 163 Ariz. 97, 102-03, 786 P.2d 948, 953-54 (1990) (holding that defendant who did not testify at trial waived any challenge to a pretrial ruling on the admissibility of his statements to police for impeachment purposes). However, because we determine that the Confrontation Clause is not implicated at all, we do not address the waiver argument and its underlying policy considerations.

23

Judge Moon thus did not err in ruling that if Ellison offered part of Finch's hearsay statements, the State could question Howe with the remainder of the conversation.[9]

## 2. Admissibility of Finch's statements to Daymond Hill

¶48    Ellison sought to introduce Finch's statements to Daymond Hill, a fellow inmate, as statements against interest.[10] In support, defense counsel offered a transcript of their interview with Hill.  In that interview, Hill stated Finch told him "that *they* did a couple of burglaries."  (Emphasis added.) Hill responded, "Just a couple of burglaries?  Well, that ain't too bad, you know."  According to Hill, Finch then added that "*he* [Finch] killed some people."  (Emphasis added.)  According to Hill, Finch "was really nervous at the time."  Hill verified that Finch used the singular regarding the murders and that

_____

[9] Although Arizona Rule of Evidence 106, by its terms, applies only to writings and recorded statements, the *Prasertphong II* rationale is equally applicable to oral statements.  The main concern in *Prasertphong II* was the inequity of allowing a defendant to admit the beneficial part of a statement while using the Confrontation Clause to prevent the State from offering the remainder of the statement in order to avoid misleading the jury.  210 Ariz. at 502 ¶ 24, 114 P.3d at 834 ("[T]he rule of completeness . . . extinguishes confrontation claims essentially on equitable grounds.") (internal quotation marks omitted).

[10] Ellison sought to introduce Hill's statements only during his guilt proceeding.  He did not seek to introduce the statements during his sentencing proceeding.

24

Finch said "*he* [Finch] strangled them or choked them or something." (Emphasis added.)

¶49      Judge Moon concluded that even if a jury believed Hill's testimony, the statements, while inculpating Finch, did not exculpate Ellison. Thus, the statements were not relevant to Ellison's involvement in the crimes. Additionally, a defendant seeking to use his accomplice's statements against interest as exculpating evidence must also provide particularized guarantees of trustworthiness. Ariz. R. Evid. 804(b)(3); *accord Prasertphong II*, 210 Ariz. at 497 n.2, 114 P.3d at 829 n.2. Judge Moon found no such trustworthiness in Finch's statements to Hill. He noted that Finch made the statements while he was in administrative segregation at the jail, housed with "the baddest of the bad." Judge Moon noted that Finch had said he feared retaliation and he may have simply bragged about the murders to protect himself.

¶50      Ellison now argues that the minimal threshold for relevance is met because Finch's statements to Hill make it more likely that Finch chose to kill the victims himself, rather than that Ellison masterminded the robberies and murders. The statements do make it somewhat more likely that Finch physically killed both victims, which is not inconsistent with either Finch's or Ellison's version of the murders. The statements may

25

be marginally relevant to support Ellison's claim that Finch, as the ringleader, forced Ellison to participate in the murders.

¶51    This, however, does not mean that the statements are relevant to Ellison's guilt.    Duress is not a defense for "offenses involving homicide," which include premeditated murder and felony murder.    A.R.S. § 13-412(C) (2001).    Thus, any error in excluding evidence of duress at the guilt proceeding for a murder trial is harmless.    *State v. Encinas*, 132 Ariz. 493, 496, 647 P.2d 624, 627 (1982) (noting that duress is not a defense to crimes involving homicide, whether premeditated murder or felony murder, or serious bodily injury).    We hold that Judge Moon did not err in excluding Finch's hearsay statements to Hill or, alternatively, that any error was harmless.

### 3. Cross-examination of Vivian Brown

¶52    At trial, Brown testified that she saw Ellison working two houses away from her parents' house during the monsoon season of 1998.    The prosecutor asked if it would have been in July or August.    She replied, "I would say."    On cross-examination, defense counsel sought to impeach Brown by questioning her about Ellison's Arizona Department of Corrections ("ADOC") record, which showed he was in prison from May 1998 through January 1999.    Judge Moon ruled that the ADOC record was hearsay that defense counsel could not use in cross-examining Brown.    He invited defense counsel to seek to

26

introduce the record itself as evidence, but counsel did not do so. A trial court's ruling regarding the scope of cross-examination is reviewed for an abuse of discretion. *State v. McElyea*, 130 Ariz. 185, 187, 635 P.2d 170, 172 (1981).

¶**53** Ellison now argues that, under Arizona Rule of Evidence 608(b), Judge Moon should have allowed him to cross-examine Brown regarding the ADOC records. Rule 608(b) allows inquiring into specific instances of a witness's conduct for impeachment purposes. The ADOC records, however, did not deal with Brown's conduct. Nor did Brown have any knowledge about the records. Thus, the records do not meet Rule 608's requirements. Additionally, the records are hearsay, Ariz. R. Evid. 801, and not admissible unless they fall under some hearsay exception, Ariz. R. Evid. 802. Defense counsel failed to offer the ADOC records into evidence under a hearsay exception. Judge Moon did not abuse his discretion in ruling that the ADOC records could not be used during Brown's cross-examination absent their admission into evidence.

### 4. Finch's visible reactions when discussing Ellison

¶**54** At trial, Judge Moon sustained a defense objection and ruled that Detective Watson could not speculate whether Finch's body language and actions during interrogation were intended to convey fear of Ellison. Judge Moon did, however, allow the State to establish that Finch's actions and body language were

27

visibly very different when Finch spoke about Ellison. Detective Watson then testified that when Finch discussed Ellison, his hands shook, his voice broke, and his eyes welled up as if about to cry. Defense counsel did not object to this testimony, and we therefore review only for fundamental error.

¶55        Ellison now argues that Detective Watson's testimony was inadmissible hearsay that violated the Confrontation Clause because, when Finch made these "statements," he was the sole suspect. Finch, Ellison contends, sought to express his alleged fear of Ellison through nonverbal conduct because Finch claimed to have acted under duress.

¶56        Nonverbal conduct is hearsay if it is intended to be an assertion. Ariz. R. Evid. 801; *see also, e.g.*, *State v. Satterfield*, 340 S.E.2d 52, 54 (N.C. 1986) (showing police a kitchen drawer where the knives were kept in response to questioning); *State v. Townsend*, 467 S.E.2d 138, 141 (S.C. Ct. App. 1995) (pointing out the DUI driver in response to police questioning). Here the nonverbal conduct by Finch was not in response to police questioning about his feelings regarding Ellison. Moreover, Ellison does not offer any other specific evidence or circumstances indicating Finch intended his conduct to assert his fear of Ellison. *See, e.g.*, *Markgraf v. State*, 12 P.3d 197, 199 (Alaska Ct. App. 2000) (concluding facial expressions, nervousness, repeatedly looking over shoulder and

28

low voice not hearsay); *State v. Thomas*, 533 A.2d 553, 557 (Conn. 1987) ("Nonassertive conduct such as running to hide, or shaking and trembling, is not hearsay."); *Layman v. State*, 652 So. 2d 373, 375 (Fla. 1995) (determining testimony regarding victim's crying and fear were "observations of physical demeanor" was not hearsay). Mere speculation as to Finch's intent, without independent evidence, is not enough. Finch's change in behavior does not appear intended as an assertion. The trial judge did not commit fundamental error in allowing the detective's testimony about Finch's behavior.

### 5. Handgun found at the home of Ellison's girlfriend

¶57    Police executed a search warrant at the home of Cathie Webster-Hauver. In the search, Detective Auld discovered a .22 caliber handgun in a car parked in the garage. Webster-Hauver told police that Ellison possessed the gun at some point. Additionally, Webster-Hauver's daughter told police that Ellison had been at their house after February 24. The State's latent print examiner later matched Ellison's fingerprint to one of eight fingerprints on the gun; however, she could not tell how long his fingerprint had been on the gun. Finch's fingerprints were not found on the gun. At trial, defense counsel objected on relevancy grounds to evidence regarding this gun. Having lost that motion, counsel renewed the objection in a motion for a new trial.

29

¶58     The trial court did not abuse its discretion in admitting the evidence about the gun found in the car at the house of Ellison's girlfriend.  This evidence establishes that Ellison possessed a gun before and after the crime, and combined with other evidence that Finch did not possess a gun, makes less likely Ellison's story that he participated only because Finch threatened him with a gun.

### 6. Cumulative error doctrine

¶59     Ellison argues the severity and finality of the death penalty warrant application of the cumulative error doctrine.  As Ellison recognizes, however, this court usually does not subscribe to the cumulative error doctrine, *State v. Dickens*, 187 Ariz. 1, 21, 926 P.2d 468, 488 (1996), and, in any event, none of the above claims independently prove prejudicial error.[11]

### E. Mistrial based on testimony regarding Ellison's gun

¶60     At trial, Detective Auld testified that police searched Webster-Hauver's house, in part, to find "the gun that was described [to police] by Mr. Finch."  Defense counsel chose not to object immediately to avoid emphasizing the statement before the jury.  Later, defense counsel suggested that the court strike the statement.  The prosecution, surprised by the

---

[11] This court does recognize the cumulative error doctrine in the context of prosecutorial misconduct.  *State v. Hughes*, 193 Ariz. 72, 78-79 ¶ 25, 969 P.2d 1184, 1190-91 (1998).

testimony, offered not to use Detective Auld's statement in closing. Judge Moon, while recognizing a potential Confrontation Clause problem, observed that the instructions could prevent any improper inferences by the jury. The parties ultimately agreed that the statement would not be stricken so as not to draw attention to it. Defense counsel did not request any specific jury instructions. Ellison now argues that Judge Moon's failure to sua sponte order a mistrial or to provide a specific limiting instruction was extremely prejudicial.

¶61 A defendant generally waives his objection to testimony if he fails either to ask that it be stricken, with limiting instructions given, or to request a mistrial. *State v. Holmes*, 110 Ariz. 494, 496, 520 P.2d 1118, 1120 (1974). Absent fundamental error, a defendant cannot complain if the court fails to sua sponte give limiting instructions, *State v. Finch*, 202 Ariz. 410, 415 ¶ 19, 46 P.3d 421, 426 (2002), or to sua sponte order a mistrial, *State v. Laird*, 186 Ariz. 203, 207, 920 P.2d 769, 773 (1996).

¶62 Here, there was no fundamental error. Detective Auld's reference was brief and the State did not use this statement in closing. Additionally, the jurors did not hear any specific evidence or argument regarding Finch's duress claim and likely were not even aware that Finch claimed Ellison pointed a gun at him. As the State points out, the jury might have

31

thought that Auld's reference concerned one of the guns taken from the Bouchers' house.

## F. Reasonable doubt instruction

¶63     Ellison, relying on *State v. Perez*, 976 P.2d 427, 442 (Haw. Ct. App. 1998), *rev'd in part*, 976 P.2d 379 (Haw. 1999), argues that the reasonable doubt instruction's use of the phrase "firmly convinced" improperly reduced the State's burden of proof to "clear and convincing."  The reasonable doubt instruction, however, comports with *State v. Portillo*, 182 Ariz. 592, 594-96, 898 P.2d 970, 972-74 (1995).  This court has expressly declined to follow the *Perez* decision on this point, *State v. Van Adams*, 194 Ariz. 408, 417-18 ¶¶ 29-30, 984 P.2d 16, 25-26 (1999), and has recently reaffirmed a "preference" for the *Portillo* instruction, *State v. Dann*, 205 Ariz. 557, 575-76 ¶ 74, 74 P.3d 231, 249-50 (2003).

## G. Motion for judgment of acquittal

¶64     Ellison argues the trial judge erred in denying his motion for acquittal because the State failed to present evidence that he specifically intended to aid or assist Finch in committing premeditated murder.

¶65     A conviction will be reversed for insufficient evidence only if it is not supported by substantial evidence. *State v. Henry*, 205 Ariz. 229, 232 ¶ 11, 68 P.3d 455, 458 (App. 2003).  "Substantial evidence is more than a mere scintilla and

32

is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Mathers*, 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990) (internal citation and quotation marks omitted).

¶66     A person commits premeditated murder if "[i]ntending or knowing that the person's conduct will cause death, such person causes the death of another with premeditation." A.R.S. § 13-1105(A)(1) (1999). To establish premeditation, "the state must prove that the defendant acted with either the intent or knowledge that he would kill his victim and that such intent or knowledge preceded the killing by a length of time permitting reflection." *State v. Murray*, 184 Ariz. 9, 32, 906 P.2d 542, 565 (1995).

¶67     A defendant may be liable as an accomplice under A.R.S. § 13-303(A)(3) "only for those offenses the defendant intended to aid or aided another in planning or committing." *State v. Phillips*, 202 Ariz. 427, 436 ¶ 37, 46 P.3d 1048, 1057 (2002) (finding that accomplice in robbery was not an accomplice to murder because he did not intend to aid or assist in the murder).

¶68     In general, duress is not a defense to any offense involving homicide. A.R.S. § 13-412(C). As Ellison acknowledges, duress is not a defense to murder physically

committed by the defendant. Thus, if Ellison had actually killed both victims, he could not avoid a premeditated murder conviction simply because he acted under duress. Ellison, however, argues that, under *Phillips*, duress should be a defense to accomplice liability, because a person acting under duress does not have the specific intent to aid or assist a premeditated murder. Ellison confuses the distinct concepts of motive and intent.

¶69    Just as we have refused to recognize duress as a defense to felony murder even when the defendant did not physically kill the victim, *Encinas*, 132 Ariz. at 496, 647 P.2d at 627, we now decline to recognize duress as a defense to accomplice liability for murder. *Phillips* does not require a contrary rule. The focus, rather, is on whether the facts show Ellison's specific intent to aid or assist Finch in the murders apart from his intent to assist Finch in committing burglary. If a defendant has the specific intent to assist in murder, even though his sole motivation is duress, *Phillips* is satisfied.

¶70    A reasonable fact-finder could have inferred that Ellison intentionally aided or assisted Finch in killing the Bouchers, or even killed Mr. Boucher himself. The evidence indicated that Ellison knew the victims, planned the night-time invasion of their home, and did not attempt to conceal his identity from them. Ellison supplied the gloves he and Finch

34

used in committing the crimes and led Finch to the scene.  As the State notes, the manner in which Ellison and Finch killed the Bouchers also shows premeditation.  They bound them, making them helpless to stop the robbery, but still suffocated them. The medical examiner testified that suffocation takes several minutes to complete.  The medical examiner also testified that the victims had defensive wounds on their bodies.  Ellison's argument under *Phillips* fails.

### III. Sentencing issues

### A. *Enmund/Tison* findings

¶71     The Eighth Amendment does not allow the death penalty to be imposed on a defendant unless he either "himself kill[s], attempt[s] to kill, or intend[s] that a killing take place or that lethal force will be employed," *Enmund v. Florida*, 458 U.S. 782, 797 (1982), or is a major participant in the crime and acts with reckless indifference, *Tison v. Arizona*, 481 U.S. 137, 157-58 (1987).

¶72     Before the guilt proceeding, Judge Moon granted Ellison's request for the jury to make specific findings on the *Enmund/Tison* factors.[12]  The jury ultimately found Ellison guilty

---

[12]  The current statute requires the jury to make this determination, *see* A.R.S. § 13-703.01(P) (Supp. 2005), even though a jury determination is not constitutionally required, *Ring v. Arizona* (*Ring III*), 204 Ariz. 534, 563-65 ¶¶ 97-101, 65 P.3d 915, 944-46 (2003).

of both premeditated and felony murder. It further found that Ellison "either killed, intended to kill, or acted with reckless indifference towards the life or death" of both Lillian and Joseph Boucher.

¶73    Ellison now argues the evidence showed that Finch actually killed both victims. Citing *Lacy*, 187 Ariz. at 352, 929 P.2d at 1300, Ellison also argues that the State did not prove that he acted with reckless indifference. The defendant in *Lacy*, however, was not present when the actual killer bound and gagged the victim; he only witnessed the killing afterwards. *Id.* at 351-52, 929 P.2d at 1299-300. Ellison, on the other hand, was not merely present during the burglary and subsequent murders. He directly participated in binding the victims and holding a pillow over Mr. Boucher's face. A reasonable factfinder could conclude that Ellison acted at least with reckless indifference to the victims' lives.[13]

### B. Post-*Ring* sentencing issues

¶74    Ellison raises several issues unique to death penalty cases that began before the *Ring II* decision and concluded after the legislature amended Arizona's statutes to provide for jury findings of aggravating and mitigating circumstances and jury

---

[13] *Enmund/Tison* findings are not aggravators, *Ring III*, 204 Ariz. at 564-65 ¶¶ 99-101, 65 P.3d at 945-46, and, consequently, are not subject to our independent review.

sentencing. *See* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, §§ 3, 7(B). As detailed below, this court's recent decisions, particularly *Anderson II*, 210 Ariz. at 327, 111 P.3d at 369, have considered and rejected several identical arguments.

### 1. Standard of review under A.R.S. § 13-703.05

¶75     Ellison now concedes that A.R.S. § 13-703.05 (Supp. 2005) does not apply to his case. Rather, under A.R.S. § 13-703.04, this court will independently review whether a death sentence is warranted in cases where the crime occurred before the effective date of § 13-703.05. *State v. Carreon*, 210 Ariz. 54, 65 ¶ 50 n.11, 107 P.3d 900, 911 n.11 (2005).

### 2. Failure to indict Ellison for a capital crime

¶76     Ellison argues that the aggravating factors listed in A.R.S. § 13-703 increase his potential punishment and, thus, must be included in the indictment. This argument was most recently rejected in *Anderson II*, 210 Ariz. at 346 ¶ 78, 111 P.3d at 388.[14]

---

[14] Ellison recognizes that this court has determined that the indictment clause of Article 2, Section 30, of the Arizona Constitution does not require aggravators to be specified in the indictment. *McKaney v. Foreman*, 209 Ariz. 268, 271-72 ¶¶ 16-17, 100 P.3d 18, 21-22 (2004). He raises this argument under the Fifth Amendment to the United States Constitution "to avoid preclusion to argue in federal court that the due process clause of the Fourteenth Amendment should incorporate the indictment clause of the Fifth Amendment."

### 3. Absence of pretrial notice of aggravating factors

¶77    The State gave notice of its intent to seek the death penalty on April 1, 1999.  Ellison later requested pre-trial notice of the aggravating circumstances.  Under the then-existing Rule 15.1(g)(2) of the Arizona Rules of Criminal Procedure, however, such notice was required only after conviction.  The State gave formal notice of six aggravators on January 29, 2002, just ten days after the guilty verdicts and, ultimately, more than two years before the sentencing proceeding, allowing Ellison sufficient time to prepare his defense.  *See Anderson II*, 210 Ariz. at 347 ¶ 80, 111 P.3d at 389 (noting defendant had actual notice more than a year before aggravation phase).  Moreover, even before the State formally noticed the aggravators, Ellison had notice of those on which the State would ultimately rely, inasmuch as they were referenced in the State's arguments at the bail hearing and in Ellison's own pretrial motion to declare A.R.S. § 13-703 unconstitutional.

¶78    Ellison argues that the aggravator notice rule in effect at the time of his trial violates the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because, under *Ring II*, aggravators are treated as elements for notice and due process purposes.  He also argues that a new sentencing jury cannot be impaneled because A.R.S. § 13-703.01(E) requires

38

the trier of fact to determine aggravators "based on the evidence that was *presented at the trial* or at the aggravation phase." (Emphasis added.) Finally, Ellison argues that the failure to give pre-trial notice created a risk the death penalty will be imposed in an arbitrary and capricious manner, violating the Eighth Amendment's heightened reliability requirement. All of these arguments were rejected in *Anderson II*, 210 Ariz. at 347 ¶¶ 79-80 & 82, 111 P.3d at 389.

¶79 Moreover, Ellison has not shown any prejudice from the timing of the State's formal notice. *State v. Cropper*, 205 Ariz. 181, 184 ¶¶ 14-15, 68 P.3d 407, 410 (2003). Ellison argues that he was "lulled into *not* defending against evidence that would constitute proof of the aggravating factors" during the guilt proceeding because, under the old sentencing statute, the burden of proof at sentencing was on the State and, during sentencing, he would be able to defend against evidence introduced during the guilt proceeding. Under the amended version of A.R.S. § 13-703.01(E), however, the trier of fact determines aggravators based on "the evidence that was presented *at the trial* or at the aggravation phase." (Emphasis added.)

¶80 Ellison fails to note that, under A.R.S. § 13-703(D), evidence admitted at the guilt proceeding is deemed admitted at a sentencing proceeding *only if* the trier of fact is the same in both the guilt and sentencing proceedings. Here, however, a new

39

jury sentenced Ellison. In the sentencing proceeding, the State had the burden of proof and was required to reintroduce evidence from the guilt proceeding, and Ellison could defend against such evidence. Ellison's incentives to defend against evidence during the guilt proceeding were not altered by the fact that a second jury, rather than Judge Moon, determined that the death sentence should be imposed.[15] *Cf. Anderson II*, 210 Ariz. at 347 ¶ 80, 111 P.3d at 389. If anything, Ellison benefited from the second jury, which heard less aggravating evidence than did the guilt proceeding jury.

**4. Separate juries for guilt and aggravation/penalty phases**

**¶81** Ellison argues that applying A.R.S. § 13-703.01 was unconstitutional because he was sentenced before a jury that did not hear the guilt proceeding of his trial and he was not afforded a right to an individualized sentencing determination under the Eighth Amendment. *Anderson II*, however, rejected these challenges. 210 Ariz. at 347-48 ¶¶ 81-86, 111 P.3d at 389-90.

---

[15] Ellison claims his counsel could not effectively defend against evidence at the guilt proceeding without notice of the aggravators. While specific ineffective assistance of counsel claims cannot be raised on direct appeal, *State v. Spreitz*, 202 Ariz. 1, 3 ¶ 9, 39 P.3d 525, 527 (2002), Ellison is arguing that defense attorneys categorically cannot effectively defend if aggravators are not identified before trial, and we reject this argument.

¶82 Ellison cannot complain that evidence relevant to sentencing was presented at the guilt proceeding. As in *Anderson II*, nothing prevented him from introducing evidence from the guilt proceeding at his sentencing proceeding. *Id.* ¶¶ 83-84. Moreover, there is no constitutional requirement that the sentencing proceeding jury revisit the prior guilty verdict by considering evidence of "residual doubt." *See Oregon v. Guzek*, 126 S. Ct. 1226, 1230-32 (2006) (acknowledging precedent has not established such a right).

¶83 Ellison also argues that the statute violates the Eighth Amendment by allowing the guilt proceeding jury to shift responsibility to the sentencing jury. This argument was rejected in *Anderson II*, 210 Ariz. at 337 ¶¶ 21-23, 111 P.3d at 379.

### 5. Double jeopardy claim

¶84 Ellison argues that sentencing is a trial for double jeopardy purposes. He further argues that, when he was found guilty in January 2002, he could not have been sentenced to death because the then-existing death penalty statute was later held unconstitutional. Thus, applying the new death penalty statute impermissibly increased his potential punishment. These arguments were rejected by *Anderson II*, 210 Ariz. at 348 ¶ 87, 111 P.3d at 390 (noting that a defendant who had not been sentenced to death when *Ring II* was decided was, for all

41

relevant purposes, situated identically to the *Ring III* defendants), and *Ring v. Arizona* (*Ring III*), 204 Ariz. 534, 550 ¶ 39, 65 P.3d 915, 931 (2003).

### 6. Due process retroactivity claim

¶85    Ellison argues that sentencing him under a statute enacted after he was convicted violated his due process rights because defense counsel had prepared for sentencing by the trial judge, not a jury.  *Anderson II* rejected a similar argument. 210 Ariz. at 346 ¶ 75, 111 P.3d at 388.

### C. Selection of the aggravation/penalty jury

¶86    The jury questionnaire's only death qualification question asked whether the possibility of the death penalty would "prevent or substantially impair" the juror's ability to fairly decide Ellison's sentence.    Ellison, relying on *Wainwright v. Witt*, 469 U.S. 412, 424-25 (1985), and *State v. Anderson* (*Anderson I*), 197 Ariz. 314, 318-24 ¶¶ 5-24, 4 P.3d 369, 373-79 (2000), argues that this question is not the "searching inquiry" required by case law.

¶87    Ellison, however, mischaracterizes the jury selection process in his case.  In addition to the juror questionnaire, the potential jurors were subjected to extensive oral voir dire. The voir dire distinguishes this case from *Anderson I*, in which the trial judge *refused* to conduct oral voir dire and dismissed

42

jurors for cause based on generalized answers in the written jury questionnaire. 197 Ariz. at 319 ¶ 10, 4 P.3d at 374.

¶88 Ellison also objects specifically to the striking of potential jurors 17 and 19. Rulings on motions to strike prospective jurors are reviewed for an abuse of discretion. *State v. Glassel*, 211 Ariz. 33, 45 ¶ 36, 116 P.3d 1193, 1205 (2005). A death sentence cannot be upheld if the jury was selected by striking for cause those who "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968).

¶89 A judge, however, may strike for cause a potential juror whose views regarding the death penalty "would prevent or substantially impair the performance of his duties as a juror." *Wainwright*, 469 U.S. at 424 (internal quotation omitted). Such views need not be proven with "unmistakable clarity." *Id.* (internal quotation omitted); *accord Anderson I*, 197 Ariz. at 318-19 ¶ 9, 4 P.3d at 373-74. Rather, even if a juror is sincere in his promises to uphold the law, a judge may still reasonably find a juror's equivocation "about whether he would take his personal biases in the jury room" sufficient to substantially impair his duties as a juror, allowing a strike for cause. *Glassel*, 211 Ariz. at 48 ¶¶ 49-50, 116 P.3d at 1208; *accord State v. Montaño*, 204 Ariz. 413, 422-23 ¶¶ 38-40, 65 P.3d

43

61, 70-71 (2003) (finding strike for cause proper where juror indicated much reservation and conflict about the death penalty).

¶90        Here, the prosecution moved to strike juror 19 for cause after she said, "if it come[s] to the point could I be for the death penalty, I don't know if I could do that.  I might say no, I can't do that."  She stated it was possible that, even if the jury found multiple aggravating factors and no mitigating factors, she would not vote for the death penalty or would find it hard to do so.  In fact, it would be *more* possible for her to ignore the law, and vote in favor of life over death, than to follow the law.  She quantified "more possible" as sixty percent.  She also said, "it would still be really hard to vote for the death penalty, *even if* it's all right there in front of my nose."  In granting the motion to strike, Judge Moon remarked that juror 19 went "beyond being against the death penalty, . . . [by] saying she's just not sure she can follow the law."

¶91        Juror 19, like the potential juror in *Montaño*, expressed reservations and conflict about the death penalty. She could not definitely say whether her beliefs would cause her to ignore the law.  Like the potential juror in *Glassel*, juror 19 gave statements indicating her beliefs could substantially impair her ability as a juror, even though she also promised to

44

uphold her oath.  The trial judge did not abuse his discretion in allowing the prosecution to strike juror 19 for cause.[16]

**D. Imputing aggravators to Ellison based on Finch's conduct**

¶92    Ellison argues that the instruction on accomplice liability impermissibly allowed the jury to impute Finch's conduct to Ellison for purposes of the statutory aggravators and that the evidence was insufficient to prove the pecuniary gain, especially cruel, and multiple murders aggravators under A.R.S. § 13-703(F)(5)-(6), (8).  Because this court independently reviews whether the aggravators were proven beyond a reasonable doubt, Ellison's sufficiency of the evidence arguments are addressed *infra*, ¶¶ 117-30.

¶93    Under *Phillips*, a defendant cannot be held liable as an accomplice for crimes that he did not specifically intend to promote or facilitate.  202 Ariz. at 436 ¶¶ 38-41, 46 P.3d at 1057.  Judge Moon gave the following accomplice liability instruction:

> An accomplice is a person who, with intent to promote or facilitate the commission of an offense, aids, counsels, agrees to aid, or attempts to aid another person in planning or committing *the* offense.

(Emphasis added.)

---

[16] Ellison also appeals Judge Moon's denial of his motion to strike potential juror 17 for cause.  Juror 17 did not ultimately sit on the jury; thus, any error is harmless. *Glassel*, 211 Ariz. at 50 ¶ 57, 116 P.3d at 1210.

45

¶94     This instruction properly required the jury to find Ellison had the specific intent to promote or facilitate the offense that he actually aided, counseled, agreed to aid, or attempted to aid.  Additionally, Judge Moon's instructions for the especially cruel and pecuniary gain aggravators properly focused on Ellison's personal intent and motivation.  They did not tell the jury to impute Finch's intent to Ellison.

¶95     Regarding the multiple murders aggravator, A.R.S. § 13-703(F)(8) requires only that the defendant be *convicted* of "one or more other homicides . . . which were committed during the commission of the offense."  Here, Ellison was convicted of both premeditated murder and felony murder for each victim. "The [premeditated and felony murder] convictions satisfy the element of intent for the murders."  *State v. Prasertphong* (*Prasertphong I*), 206 Ariz. 167, 171 ¶ 18, 76 P.3d 438, 442 (2003), *vacated on other grounds*, 541 U.S. 1039 (2004).

### E. Especially cruel instruction

¶96     In *Walton v. Arizona*, the United States Supreme Court held that Arizona's "especially heinous, cruel or depraved" aggravating factor was unconstitutionally vague on its face. 497 U.S. 639, 654 (1990), *overruled in part by Ring III*, 536 U.S. at 586-87; *see also Anderson II*, 210 Ariz. at 352 ¶ 109, 111 P.3d at 394.  A facially unconstitutional aggravator, however, may be remedied by narrowing instructions.  *Walton*, 497

46

U.S. at 653-54; *Anderson II*, 210 Ariz. at 352 ¶ 109, 111 P.3d at 394. This is true whether a judge or a jury makes the sentencing determination. *See Anderson II*, 210 Ariz. at 352-53 ¶ 111, 111 P.3d at 394-95 (relying on the narrowing instructions as giving substance to the "especially heinous, cruel or depraved" aggravator when a jury made the sentencing decision). Thus, the proper inquiry is whether the jury instructions adequately narrowed "especially cruel."

¶97  Here, Judge Moon gave the following "especially cruel" aggravator instruction:

> In order to find that the especially cruel aggravating circumstance is present as to either murder, you must find that the State has proven beyond a reasonable doubt that the murder was especially cruel due to the infliction of either extreme physical pain or extreme mental anguish upon that victim.

Judge Moon also defined "extreme mental anguish" and "extreme physical pain" for the sentencing jury.[17]

¶98  This court has previously upheld the "especially cruel" aggravator when narrowing instructions "focuse[d] on the victim's state of mind." *Anderson II*, 210 Ariz. at 352-53 ¶ 111 n.19, 111 P.3d at 394 n.19. The *Anderson II* instructions, while not identical to those here, are quite similar. For example,

---

[17] Because we find the State did not prove "extreme physical pain," *infra*, ¶ 121 n.9, we do not address the jury instructions concerning this aspect of the "especially cruel" aggravator.

47

*Anderson II* and this case both require proof that the defendant knew or should have known he placed the victim in physical pain or mental anguish. *See id.* Both also require that the victim be conscious during the physical violence or mental anguish. *See id.*

¶99     For mental suffering, the *Anderson II* instructions require that the victim "experienced significant uncertainty as to his or her ultimate fate." *Id.* This case's instructions require that the victim "experienced extreme fear or extreme anxiety by being made aware that he or she was going to die." If anything, being aware that you are going to die is *more* restrictive than having significant uncertainty about your fate. We find the "especially cruel" narrowing instructions allowed the sentencing jury to constitutionally apply the aggravator.

### F. Unconstitutional presumption of death

¶100     Ellison argues that Arizona's death penalty statute creates an unconstitutional presumption of death and impermissibly shifts to him the burden of proving that mitigation is sufficiently substantial to call for leniency. This court has rejected these arguments. *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 471-72 ¶¶ 12-13, 123 P.3d 662, 665-66 (2005).

## G. Requirement of jury unanimity for leniency

¶101    Pursuant to A.R.S. § 13-703.01(H), the trial judge instructed the sentencing jurors that they were required to unanimously determine whether the death sentence should be imposed. Additional jury instructions made clear that the jury did not have to unanimously find the existence of a mitigating circumstance before a juror could individually consider it in sentencing. Unanimity was required only in regard to the ultimate sentencing decision.

¶102    Ellison now argues that the instructions violate *McKoy v. North Carolina*, 494 U.S. 433 (1990), and *Mills v. Maryland*, 486 U.S. 367 (1988). We disagree. These decisions do not prohibit states from requiring a unanimous vote in order to impose a life sentence. Rather, these cases hold that, because jurors must be allowed to consider any relevant mitigation evidence in making their sentencing decision, sentencing statutes cannot require the jurors to unanimously find the existence of *any individual mitigating circumstance* before the mitigator can be considered. *McKoy*, 494 U.S. at 439-40; *Mills*, 486 U.S. at 379-80. A juror's individual decision regarding the existence and weight of a particular mitigating circumstance is different from the jury's ultimate sentencing decision. The instructions here were proper under *Mills* and *McKoy*. *See Anderson II*, 210 Ariz. at 350 ¶¶ 98-99, 111 P.3d at 392.

49

## H. Disparate sentences as mitigation

¶103    At sentencing, Ellison's defense counsel elicited testimony that Finch received a life sentence. The State later asked to present evidence regarding the particular mitigating circumstances found in Finch's case. Defense counsel objected, based on the Confrontation Clause, to any evidence other than the facts that Finch was not on parole and did not have any prior serious felonies. Defense counsel also refused to stipulate to admission of the special verdict from Finch's sentencing. Judge Moon was concerned that revealing the entire special verdict might inappropriately sway the jury, given he was the same judge who sentenced Finch, or otherwise prejudice the parties.

¶104    After much discussion, the parties finally concurred that Judge Moon should instruct the jury that Finch received a life sentence, that "circumstances proven in the Finch case were different," and that "[t]here is no way to explain all of the differences to [them] under our legal system." Ellison now claims that, by limiting the evidence regarding Finch's sentence, the trial judge effectively prohibited the jury from considering the disparate sentences.

¶105    "A disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance if no reasonable explanation exists for the disparity." *State v. Kayer*, 194

50

Ariz. 423, 439 ¶ 57, 984 P.2d 31, 47 (1999). Only the *unexplained* disparity is significant. *Dickens*, 187 Ariz. at 26, 926 P.2d at 493. Additionally, if there is a finding of an especially cruel, heinous or depraved aggravator, "even unexplained disparity has little significance." *State v. Schurz*, 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993).

¶106 It is not entirely clear which facts of Finch's sentence Ellison is now arguing should have been admitted. If he is arguing the entire special verdict should have been admitted, he waived this argument by refusing to stipulate to admission of the special verdict. Having invited any error in that regard, Ellison cannot now benefit from it on appeal. *See State v. Roseberry*, 210 Ariz. 360, 369 ¶ 53, 111 P.3d 402, 411 (2005) (finding defendant waived argument by inviting error at trial).

¶107 If he is arguing only that certain facts should have been admitted, such as Finch's guilty verdicts and the trial judge's determination that the State failed to prove pecuniary gain, fairness also dictates against admitting only portions of Finch's special verdict.[18] A disparity in sentences is

---

[18] Ellison is also incorrect in arguing that the special verdict from Finch's sentencing shows Finch actually killed both victims. The special verdict specifically states that Finch "did not anticipate the murders and did not intentionally assist in the murder of Mr. Boucher. . . . [T]he murder of Mr. Boucher

51

constitutionally relevant only if it is unexplained. Thus, if particular facts about Finch's sentence were admitted, all of the differences between the aggravators and mitigators of each case should be admitted to avoid misleading the jury.

¶108    Here, there was no unexplained disparity. In Finch's case, Judge Moon determined that Ellison, as the ringleader, forced Finch to kill Mrs. Boucher. Judge Moon determined that Finch acted under duress and was not motivated by pecuniary gain. *See Schurz*, 176 Ariz. at 57, 859 P.2d at 167 (finding sentences not disparate when the jury found defendant guilty of premeditated murder and rejected argument that co-defendant actually set the victim on fire). Additionally, Finch, unlike Ellison, was not on parole and had no serious felonies in his criminal background. *See Henry*, 189 Ariz. at 551, 944 P.2d at 66 (stating two defendants' "distinct criminal backgrounds were sufficient to justify the disparity in penalties"). Thus, Judge Moon did not abuse his discretion in limiting the evidence so as to accommodate Ellison's disparate sentences argument while avoiding undue prejudice to either side.

---

legally involved [Finch] *only* because he was an accomplice to the predicate felony offense [of burglary]." (Emphasis added.)

## I. Victim impact statement

¶109      Ellison moved to prohibit the State from introducing Vivian Brown's victim impact statement as irrelevant to aggravation, highly prejudicial, and too emotional in the context of jury sentencing.  Judge Moon precluded the State from using the statement during its case-in-chief but allowed it as rebuttal of the defense's mitigation evidence.  Judge Moon also told Brown that she could not make a sentencing recommendation.

¶110      At the penalty phase, Brown showed the jury several family photos while she talked about her parents, their family, and the impact of their deaths.  Over the defense's objection, the trial judge admitted one in-life photo of the victims and allowed the jury to take it in to the jury room.  Brown also talked about her parents' murders, stating, "They could hear.  I know they could still hear."

¶111      Under A.R.S. § 13-703.01(R), "the victim may present information about the murdered person and the impact of the murder on the victim and other family members and may submit a victim impact statement in any format to the trier of fact." These statements are relevant to the issue of the harm caused by the defendant.  Thus, they do not violate the Eighth Amendment. *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 17, 68 P.3d 412, 417 (2003) (relying on *Payne v. Tennessee*, 501 U.S. 808, 827

(1991)).  A victim may not, however, recommend a particular sentence.  *Id.* ¶¶ 16-17.

¶112    Ellison now argues that A.R.S. § 13-703.01(R) violates the Eighth and Fourteenth Amendments by infusing irrelevant emotion into the sentencer's consideration of mitigation evidence.  He relies on *Payne* to argue that the Supreme Court recognizes that such statements have only minimal relevance in showing that "'the victim is an individual whose death represents a unique loss to society and in particular to his family.'"  501 U.S. at 825 (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (White, J., dissenting)).

¶113    Ellison misapprehends the holding in *Payne*.  The language he relies on is the Court's explanation of its earlier decision in *Booth* that victim impact statements were not relevant because they "do not in general reflect on the defendant's 'blameworthiness.'"  *See Payne*, 501 U.S. at 819.  The Court granted review in *Payne*, in part, to re-examine its holding in *Booth*.  *Payne* concluded that *Booth* was wrong on this point, *id.* at 825, and "removed the per se bar to the admission of victims' statements regarding the effect of a crime upon their lives" so long as the statements were relevant to the issue of sentencing.  *Lynn*, 205 Ariz. at 191 ¶ 16, 68 P.3d at 417.

54

¶114    The trial judge here properly instructed Brown not to make a sentencing recommendation.    The judge also offered defense counsel the option of having Brown sworn in and cross-examined.    Defense counsel declined this offer.    Finally, the trial judge instructed the jurors that they could consider Brown's statements only to understand the victims as unique individuals; they could not consider her statements as establishing an aggravating circumstance or as providing a sentencing recommendation.    Thus, Ellison's argument fails on this point.

¶115    We recognize the danger that photos of the victims may "be used to generate sympathy for the victim and his or her family."    *State v. Doerr*, 193 Ariz. 56, 64 ¶ 32, 969 P.2d 1168, 1176 (1998).    We have refused, however, to adopt a per se rule barring all in-life photos in capital murder cases.    *Id.* Rather, "[i]t is for the trial court in each instance to exercise sound discretion in balancing probative value against the risk of unfair prejudice."    *Id.; accord Anderson II*, 210 Ariz. at 339 ¶ 39, 111 P.3d at 381 (discussing post-death photos).    Here, the trial judge did not abuse his discretion in allowing the jurors to take into their deliberations one in-life photo, which was "benign" as compared to the victims' post-death photos.    *See Doerr*, 193 Ariz. at 64 ¶ 33, 969 P.2d at 1176; *accord Anderson II*, 210 Ariz. at 340 ¶¶ 41-42, 111 P.3d at 382.

## J. Independent review

¶116     This court must independently review the aggravating and mitigating circumstances found during sentencing and the propriety of the death sentence.  A.R.S. § 13-703.04; *accord Roseberry*, 210 Ariz. at 373 ¶ 77, 111 P.3d at 415.

### 1. Aggravating circumstances

### a. Especially cruel aggravator

¶117     Ellison argues the State presented no conclusive evidence that the victims were conscious and suffered mental anguish during the suffocations.  *See* A.R.S. § 13-703(F)(6).

¶118     The State did not provide medical testimony regarding whether the victims were conscious during the attacks. Detective Watson, however, testified that Ellison told police that Finch initially ordered the victims into Mr. Boucher's room where Ellison then bound the victims.  Ellison also admitted that he held the pillow over Mr. Boucher's face for a period of time while Finch strangled Mrs. Boucher, causing her to defecate on herself.

¶119     In order to show a murder was especially cruel, the State must prove beyond a reasonable doubt that the victim suffered either physical pain or mental distress.  *State v. McCall*, 139 Ariz. 147, 161, 677 P.2d 920, 934 (1983).  "The defendant must intend that the victim suffer or reasonably foresee that there is a substantial likelihood that the victim

will suffer as a consequence of the defendant's acts." *Id.* This court "examine[s] the entire murder transaction and not simply the final act that killed the victim." *State v. Lavers*, 168 Ariz. 376, 393, 814 P.2d 333, 350 (1991).

¶120    Mental anguish can support an especially cruel finding.    Mental anguish is established if the victim "experienced significant uncertainty as to her ultimate fate," *Van Adams*, 194 Ariz. at 421 ¶ 44, 984 P.2d at 29 (internal citation and quotation marks omitted), or if the victim was aware of a loved one's suffering, *State v. Ramirez*, 178 Ariz. 116, 129, 871 P.2d 237, 250 (1994).   In *McCall*, we determined that victims who were bound by armed assailants were uncertain as to their fates.    139 Ariz. at 161, 677 P.2d at 934.    The victims in *McCall* also suffered mental cruelty because they were forced to listen as their loved ones were shot one at a time. *Id.*

¶121    In our independent review, we find that the evidence here establishes that the victims were conscious when they were bound, *see State v. Bible*, 175 Ariz. 549, 604-05, 858 P.2d 1152, 1207-08 (1993) (noting that "[t]he fact that her hands were bound indicates that she was conscious and tied-up to prevent struggling"), and aware of each other's suffering.   The evidence also establishes that the Bouchers were uncertain as to their ultimate fate after being attacked and bound by two men in their

57

own house at night, and they then heard one ordering the other to kill Mr. Boucher.  *See State v. Libberton*, 141 Ariz. 132, 139-40, 685 P.2d 1284, 1291-92 (1984) (finding especially cruel aggravator was proven, in part, because victim heard assailants discussing his imminent killing).  The State proved the especially cruel aggravator based on extreme mental anguish beyond a reasonable doubt.[19]

### b. Pecuniary gain aggravator

¶122     Ellison argues that, although he admitted going to the Bouchers' home to commit a burglary, the State did not present evidence that his participation in the murders was motivated by

---

[19] The State also argues the evidence shows physical cruelty, because of both the victims' physical injuries and the inherent nature of being suffocated or strangled.  This court, however, has been "unwilling to say that all stranglings are per se cruel."  *Schackart*, 190 Ariz. at 248, 947 P.2d at 325.  Additionally, the State provided the sentencing jury no specific evidence that the Bouchers consciously suffered any extreme physical pain.  "Where the evidence is inconclusive as to whether a victim was conscious during the infliction of violence to his person, the sentencing court cannot find that cruelty existed."  *State v. Gillies*, 135 Ariz. 500, 513, 662 P.2d 1007, 1020 (1983).

Further, we will not, as the State argues, consider the medical examiner's testimony presented at only the guilt proceeding.  When the sentencing jury is not the same as the guilt proceeding jury, we believe it inappropriate to consider evidence that the sentencing jury did not hear.  *Cf.* A.R.S. § 13-703.04(C) (allowing for remand "if the trial court erroneously excluded evidence or if the appellate record does not adequately reflect the evidence presented").  Based on the lack of evidence, we find the State failed to prove extreme physical pain beyond a reasonable doubt.

pecuniary gain. *See* A.R.S. § 13-703(F)(5). Ellison also argues that the jury could not impute motive based solely on the fact that he took jewelry from Mrs. Boucher's body and received twenty dollars of the Bouchers' money.

¶123    In *State v. Sansing*, we clarified the pecuniary gain aggravator:

> [A]n unexpected or accidental death that occurs during the course of or flight from a robbery, but which was not committed in furtherance of pecuniary gain, does not provide sufficient basis for an F.5 finding. Similarly, the sole fact that a defendant takes items or money from the victim does not establish pecuniary gain as a motive for the murder. Even a conviction for robbery, during which a murder occurs, does not necessarily prove pecuniary gain as motivation for the murder.

200 Ariz. 347, 354 ¶ 15, 26 P.3d 1118, 1125 (2001) (internal citations omitted), *vacated on other grounds*, 536 U.S. 954 (2002).

¶124    The State must show a "connection between the murder and motive through direct or strong circumstantial evidence." *State v. Armstrong*, 208 Ariz. 360, 363 ¶ 7, 93 P.3d 1076, 1079 (2004) (quoting *Ring III*, 204 Ariz. at 560 ¶ 76, 65 P.3d at 941). To this point, the *Sansing* opinion distinguishes between cases in which "one of the defendant's motives in committing the murder was to facilitate the taking of or ability to retain

59

items of pecuniary value" and cases of "robberies gone bad." 200 Ariz. at 354 ¶ 16, 26 P.3d at 1125.[20]

**¶125**   The record demonstrates that Ellison's motive for the murders was to facilitate the burglary.  Ellison admits going to the Bouchers' home with the intent to commit a burglary. Evidence showed that Ellison was familiar with both the area and the Bouchers.   He and Finch wore gloves while inside the Bouchers' home but did not attempt to disguise their identities. Although Ellison argued he did not intend to kill anyone and that Finch forced him to participate in the murders at gunpoint, the State presented contrary evidence.   We find this evidence establishes that Ellison planned the burglary and, in order to escape and avoid identification, killed the Bouchers.  *See id.* at 355 ¶ 21, 26 P.3d at 1126 ("We have also found that a murder committed to facilitate escape and/or hinder detection by police furthers the pecuniary interest of the criminal.")*; see also Greenway*, 170 Ariz. at 165, 823 P.2d at 32 ("Defendant also took no precautions to cover his face before he entered the house. . . .   The specific purpose of the murders was to facilitate defendant's escape and hinder detection, thereby furthering his pecuniary goal.").

---

[20]   The jury instructions on the pecuniary gain factor appropriately mirrored the clarifications made in the *Sansing* opinion.

60

¶126    Ellison also argues that the evidence the victims were bound actually supports the conclusion that the burglary was complete *before* the victims were killed.  Thus, there was a different motive for the murders.  This argument is not persuasive.  Ellison admitted to police that Finch and he took property from the Bouchers' bodies and residence *after* they were killed.  Moreover, if Ellison was motivated to kill the Bouchers in order to avoid identification, it does not matter whether the burglary or the murders occurred first.

¶127    Finally, Ellison argues that, even if pecuniary gain is found, the robbery cannot support an aggravator because it already supported the felony murder conviction and double-counting would violate the Eighth Amendment.  He also argues that the pecuniary gain aggravator does not "genuinely narrow the class of persons eligible for the death penalty."  *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  These arguments were squarely rejected in *Greenway*, 170 Ariz. at 163-64, 823 P.2d at 30-31.

### c. Multiple murders aggravator

¶128    Aggravating circumstances include the fact that "[t]he defendant has been convicted of one or more other homicides . . . which were committed during the commission of the offense."  A.R.S. § 13-703(F)(8).  It is not enough for the jury to convict the defendant of multiple homicides.  *Ring III*,

204 Ariz. at 560 ¶ 80, 65 P.3d at 941.  The homicides must also have a "temporal, spatial, and motivational relationship[]" such that they "were a part of a continuous course of criminal conduct."  *Lavers*, 168 Ariz. at 393-94, 814 P.2d at 350-51 (internal citations omitted).

¶129    The multiple murders aggravator applies so long as the defendant was found criminally liable, even if he himself did not physically commit the murders.  *See Prasertphong I*, 206 Ariz. at 171 ¶ 18, 76 P.3d at 442 (aggravator proven based on defendant's felony murder convictions because murders were "temporally, spatially, and motivationally related").

¶130    Ellison was convicted of both felony murder and premeditated murder in the deaths of each victim.  The guilt proceeding jury also made *Enmund/Tison* findings regarding the murders.  The Bouchers, a married couple residing together, were both killed in the same room at approximately the same time. According to Ellison, he and Finch went to the Bouchers' home to commit a burglary.  He does not claim the two victims were killed for different reasons.  Based on this evidence, the murders had a "temporal, spatial, and motivational relationship[]."  *Lavers*, 168 Ariz. at 393, 814 P.2d at 350. The State proved the multiple murders aggravator beyond a reasonable doubt, regardless of whether Ellison physically committed the murders, as "the jury verdicts established that

62

[Ellison] possessed the same motivation for killing the victims as did [Finch]." *Prasertphong I*, 206 Ariz. at 171 ¶ 18, 76 P.3d at 442.

### d. Other aggravators

¶131    The three other aggravators were also proven beyond a reasonable doubt:  prior conviction for a serious felony, A.R.S. § 13-703(F)(2), commission of murder while on parole, A.R.S. § 13-703(F)(7), and murder of victim age seventy or older by defendant age eighteen or older, A.R.S. § 13-703(F)(9). Ellison's prison records showed his prior conviction for armed robbery, a statutorily defined serious felony, A.R.S. § 13-703(H)(1)(h) (1999), his parole status, and the fact that he was older than eighteen when he committed the offenses.  Brown's testimony established that her parents were each older than seventy when they were murdered.

### 2. Mitigating circumstances

¶132    A defendant is not required to show a nexus between the crime and the mitigation evidence before such evidence can be considered.  *State v. Newell*, 212 Ariz. 389, 405 ¶ 82, 132 P.3d 833, 849 (2006).  Rather, the only burden is to meet the low threshold of relevancy to the issue of providing "a basis for a sentence less than death."  *Tennard v. Dretke*, 542 U.S. 274, 284-87 (2004) (internal citation and quotation marks omitted); *accord Anderson II*, 210 Ariz. at 349 ¶ 93, 111 P.3d at

63

391 (citing *Tennard*).  The relationship between the mitigation evidence and the crime, however, can affect the weight given to such evidence.  *See Newell*, 212 Ariz. at 405 ¶ 82, 132 P.3d at 849.

**¶133**    Ellison claimed five mitigating circumstances.  The first alleged mitigator was the absence of love and guidance during childhood.  One of Ellison's brothers testified regarding physical abuse by their parents and described Ellison as the family scapegoat due to his club feet.  Russell Reardon, a friend of Ellison's, testified that Ellison told him that he was sexually abused by another brother.  That brother later verified the abuse to Reardon.

**¶134**    Two juvenile corrections officers also testified that, while Ellison was at their respective facilities, Ellison's mother was cold and uninvolved, Ellison was often in the middle of his parents' fights, and his siblings never visited him.  One corrections officer also testified that he saw bruises and cuts on Ellison.  Ellison told the corrections officer that his parents had abused him.  While at one facility, Ellison learned his family had moved to Oregon right before he underwent surgery for his foot deformity.  Ellison's brother and one corrections officer, however, testified that his father was much more involved and caring.

**¶135**    Dr. Lanyon, a mitigation expert, also testified that

Ellison was constantly ridiculed by schoolmates due to his small size and foot deformities. The family moved quite a bit, resulting in new ridicule with each move. Ellison dropped out of school by the ninth grade. According to Dr. Tucker, a forensic psychiatrist, Ellison likely had Attention Deficit Disorder.

¶136 Although defense counsel argued that Ellison's childhood experiences left him less equipped to make good moral decisions, counsel acknowledged that he was not arguing Ellison was actually incapable of telling right from wrong. His childhood troubles deserve little value as a mitigator for the murders he committed at age thirty-three. *Cf. Anderson II*, 210 Ariz. at 357 ¶ 136, 111 P.3d at 399 (finding the defendant's evidence of sexual abuse, low IQ, frequent moves between schools, and follower-type personality "do[es] not in any way explain his decision, decades later at age forty-eight, to kill three innocent people to steal a pickup" as defendant was not mentally retarded and was able to tell right from wrong in making his own decisions).

¶137 The second alleged mitigator was Ellison's drug addiction. Ellison's brother testified that another brother gave Ellison alcohol and drugs when he was about fourteen. Reardon testified he gave Ellison money for cocaine and alcohol in 1992 and 1993. He said drugs made Ellison quiet and

65

withdrawn, not violent, and that Ellison did not know how to control his drug use.

¶138    The defense did not present evidence that Ellison was on drugs when he committed the burglary and murders.  In fact, Ellison said he had been clean for a month at the time of the crimes.  Dr. Tucker did testify that drug abuse can change a person's brain chemistry, causing paranoia, dementia, and impulsive behavior, and can affect a person's physical health. Dr. Tucker further testified that, for a person having experienced Ellison's upbringing, history of physical and sexual abuse, physical deformity, and extended drug and alcohol abuse, the damage would carry on into adulthood and potentially destroy the individual.

¶139    This testimony makes it more likely that Ellison did suffer some mental or emotional damage due to a combination of his upbringing, physical and sexual abuse, physical deformity, and drug and alcohol use.  Ellison, however, has not provided any specific evidence that his brain chemistry was actually altered by his past alcohol and drug abuse so as to cause or contribute to his participation in the murders.  *See id.*  This mitigator is not of such a quality or value as to warrant leniency.

¶140    The third alleged mitigator was the absence of genuine violence in his prior convictions.  Defense counsel argued

66

Ellison's prior conviction for stealing money from a store at knifepoint was not violent. In fact, Ellison invited the store clerk to a birthday party before he left the store. Ellison also told his friend, Russell Reardon, that he was only cleaning his fingernails with the knife. Reardon, however, testified that Ellison probably did pull a knife on the clerk. Dr. Lanyon opined that Ellison had sought attention rather than the money. The State also questioned Dr. Lanyon regarding another occasion when Ellison, while drunk, yelled a racial slur and fired a gun, hitting someone with a ricochet bullet. Dr. Lanyon had no knowledge of that incident.

¶141     There is little mitigation in the fact that Ellison claims he did not intend to harm a clerk whom he held at knifepoint. Likewise, there is little mitigation in the argument that his reckless discharge of a gun was not really violent because it injured another person only by a ricochet bullet rather than by a direct, intentional shot.

¶142     The fourth alleged mitigator was that Ellison's family members care about him and do not want him to die. At the sentencing proceeding, Ken Ellison testified that, while he knew what his brother had done, he was still there to testify for him. The love of a defendant's family is mitigating evidence. *State v. Carriger*, 143 Ariz. 142, 162, 692 P.2d 991, 1011 (1984). This mitigator, however, is de minimis compared to the

Bouchers' murders and the six proven aggravators. *See id.* ("However, the love between Carriger and his family has not stopped Carriger from what amounts to a lifetime of crime, and we must consider this too.").

¶143    The fifth alleged mitigator was Ellison's diminished capacity to appreciate the wrongfulness of his conduct. Defense counsel argued in closing that Ellison's childhood environment, coupled with his drug and alcohol abuse, diminished his ability to tell right from wrong. Defense counsel, however, offered no actual evidence of this diminishment. Ellison did not meet his burden of proving this mitigating circumstance.

¶144    We uphold Ellison's death penalty for each murder. Six aggravators were proven and the mitigation evidence is not sufficiently substantial to warrant leniency.

### IV. Other arguments preserved for federal review

¶145    Ellison, recognizing that this court has previously rejected them, raises fifteen other constitutional challenges in order to preserve them for federal review. Those arguments are listed in Appendix A, along with the cases that Ellison states have rejected the arguments.

## V. Conclusion

¶146    For the above reasons, we affirm Ellison's convictions and sentences.

_____
W. Scott Bales, Justice


CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice

Ellison raises the following claims to preserve them for federal review.

(1) The death penalty is per se cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992); *Gillies*, 135 Ariz. at 507, 662 P.2d at 1014.

(2) Execution by lethal injection is cruel and unusual punishment. *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

(3) The statute unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist. *Walton*, 497 U.S. at 648; *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

(4) The death penalty is unconstitutional because it fails to guide the sentencing jury. *Greenway*, 170 Ariz. at 164, 823 P.2d at 31.

(5) Arizona's death statute unconstitutionally requires defendants to prove that their lives should be spared. *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

(6) The statute unconstitutionally fails to require either cumulative consideration of multiple mitigating factors or that the jury make specific findings as to each mitigating

factor. *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994); *State v. Fierro*, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990).

(7) Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

(8) The statute is unconstitutional because there are no statutory standards for weighing. *State v. Atwood*, 171 Ariz. 576, 645-46 n.21, 832 P.2d 593, 662-63 n.21 (1992), *abrogated in part by State v. Nordstrom*, 200 Ariz. 229, 25 P.3d 717 (2001).

(9) Arizona's death statute insufficiently channels the sentencer's discretion in imposing death sentences. *State v. West*, 176 Ariz. 432, 454, 862 P.2d 192, 214 (1993), *overruled in part by State v. Rodriguez*, 192 Ariz. 58, 961 P.2d 1006 (1998); *Greenway*, 170 Ariz. at 164, 823 P.2d at 31.

(10) Arizona's death statute is unconstitutionally defective because it fails to require the State to prove that death is appropriate. *State v. Gulbrandson*, 184 Ariz. 46, 72, 906 P.2d 579, 605 (1995).

(11) The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards. *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

(12) Death sentences in Arizona have been applied arbitrarily, irrationally, and in a discriminatory manner against impoverished males whose victims have been Caucasian. *West*, 176 Ariz. at 455, 862 P.2d at 215.

(13) The Constitution requires a proportionality review of a defendant's death sentence. *Salazar*, 173 Ariz. at 416, 844 P.2d at 583; *State v. Serna*, 163 Ariz. 260, 269-70, 787 P.2d 1056, 1065-66 (1990).

(14) There is no meaningful distinction between capital and non-capital cases. *Salazar*, 173 Ariz. at 411, 844 P.2d at 566.

(15) Applying a death statute enacted after the Supreme Court's decision in *Ring v. Arizona* violates the ex post facto clauses of the federal and state constitutions and A.R.S. § 1-244. *Ring III*, 204 Ariz. at 545-47 ¶¶ 15-24, 65 P.3d at 926-28.[21]

---

[21] Ellison seeks to distinguish his case from the *Ring III* decision because he was convicted *prior* to *Ring II* and was sentenced for the first time by a jury under the new statute *after* enactment of the new legislation. *Anderson II*, decided after Ellison filed his briefs, rejects this ex post facto argument in a procedural posture identical to Ellison's case. 210 Ariz. at 346 ¶ 74, 111 P.3d at 388 (citing *Carreon*, 210 Ariz. at 60-61 ¶¶ 17-22, 107 P.3d at 906-07, and *Ring III*, 204 Ariz. at 545-51 ¶¶ 15-42, 65 P.3d at 926-32, for support).