NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JARED THOMAS CARDWELL, *Appellant*.

No. 1 CA-CR 21-0181
FILED 9-6-2022

Appeal from the Superior Court in Yuma County
No. CR 2016-00404
The Honorable Brandon S. Kinsey, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Linley Wilson
*Counsel for Appellee*

Yuma County Public Defender,
By Joshua B. Tesoriero
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge David D. Weinzweig and Judge Brian Y. Furuya joined.

---

**P E R K I N S**, Judge:

¶1　　　　Jared Thomas Cardwell appeals his conviction and sentence for second-degree murder. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2　　　　We view and thus recount the facts in the light most favorable to sustaining the verdict. *See State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013). For privacy purposes, we refer to the victims by pseudonyms. *See* Ariz. R. Sup. Ct. 111(i).

¶3　　　　In May 2015, Cardwell, a Lance Corporal in the United States Marine Corps, lived with his wife Barbara and twenty-month-old stepdaughter Cara in on-base housing at the Marine Corps Air Station in Yuma ("Yuma Base"). On May 18, Barbara spent the day with a then-healthy Cara, taking videos and photographs of her. That evening, their neighbors watched Cara while Cardwell drove Barbara to work. Neither Barbara nor the neighbors saw any scalp bruises or facial burns on Cara, and Barbara's videos and photographs depicted no such injuries.

¶4　　　　When Cardwell picked up Barbara that night, she was upset he had not brought Cara with him because she never left Cara alone at home. Cardwell told Barbara on the drive home that he "spanked [Cara] on her butt" earlier that evening because he "had taken Cara to the potty; she said that she was done; and she had an accident." Barbara had repeatedly told Cardwell she was not okay with him spanking Cara. Barbara went directly to bed once they arrived home while Cardwell checked on Cara.

¶5　　　　The next morning, after Cardwell left for work, Barbara went to Cara's room and found her "laying halfway off her bed with her head on the floor." Cara's body was cold and stiff, and Barbara could not move her or open her eyes or mouth. Barbara saw "dark red marks" on Cara's face that resembled burns and called 911.

¶6 When the paramedics arrived, they unsuccessfully tried to resuscitate Cara, who was unresponsive and had no pulse. Cara showed signs of rigor mortis and had a bright red face with dried blood near her mouth and nostrils. The paramedics transported Cara to the hospital, where an emergency-room doctor pronounced her dead. Based on her physical signs, including a core temperature of 80 degrees, the doctor concluded she died several hours earlier. Once Cardwell arrived at the hospital, Barbara immediately demanded to know what happened the night before. Cardwell apologized but denied any wrongdoing.

¶7 At the hospital, a Naval Criminal Investigative Service ("NCIS") agent spoke with Cardwell and Barbara about Cara's death. Barbara insisted she needed to tell her mother Nancy that Cara died, but she allowed the agent to examine Cara. The agent observed "large circle areas" on Cara's face that appeared burn-like. Meanwhile, other NCIS agents went to Cardwell's home to investigate.

¶8 Cardwell, Barbara, and the NCIS agent then went to Nancy's home to inform her of Cara's death. Yuma Police Department detectives arrived soon after at Nancy's home, and Cardwell agreed to go to the Yuma police station to be interviewed by a Yuma detective. During the interview, Cardwell recounted that while Barbara was at work, Cara "pooped on the floor," and he "smacked her on the butt for it." When the detective asked Cardwell how Cara died, Cardwell answered, "I really don't know, she seemed fine . . . she was just fussy more than normal when I was trying to put her to bed." Cardwell later explained the only thing he "regretted was when [he] smacked her on the butt" after he "got upset with her[.]"

¶9 A few days later, Dr. Greg Hess, the chief medical examiner for Pima County and a forensic pathologist, conducted Cara's autopsy. Dr. Hess noted she had ten subscalp bruises and many more bruises on her body. Dr. Hess concluded Cara's cause of death was a "subdural hemorrhage due to blunt force head trauma." Dr. Hess declared Cara would have died "relatively rapidly" after the impact. He also asserted that any of the head bruises could have caused the fatal hemorrhage. Dr. Hess believed Cara's facial burns were either chemical burns or scald burns from hot water.

¶10 On May 22, NCIS agents interviewed Cardwell at the Yuma police station. After Cardwell read and signed an "Article 31(b) Waiver" form, which contains the military's version of the constitutional-rights advisory required by *Miranda v. Arizona*, 384 U.S. 436 (1966), he agreed to answer questions. Cardwell told the agents: (1) when he saw that Cara had

an accident, he looked at her and said, "are you freakin serious"; (2) he then "yanked" Cara toward him, grabbed her, put her over his leg, and "smacked" her behind; (3) she "lost her mind" when he did so, experiencing one of her worst "temper tantrums"; (4) he told her that he was sorry for yanking her; (5) her reaction resembled someone who had just been "sucker punched"; and (6) she sustained her fatal injuries "under [his] watch." On a scale of one to ten, with ten being the highest, he described his anger level when he spanked Cara as a seven. Cardwell asserted neither Barbara nor his neighbors harmed Cara, and no intruders entered his house that night.

¶11         NCIS agents again interviewed Cardwell on May 26. After signing another Article 31(b) Waiver, Cardwell repeated his earlier accounts that he spanked Cara after she accidentally defecated on the floor. In this interview, at the agent's request, he demonstrated how hard he yanked Cara by grabbing and pulling the agent's arm. Cardwell's force surprised the agent. An agent asked Cardwell to describe on a scale of one to ten, with ten being the highest, the likelihood that his actions caused Cara's fatal injuries, and Cardwell answered that he would "probably say a nine." Cardwell explained he "never yanked her that hard and she'd never had a reaction as that to anything [he'd] done before[.]" Cardwell believed she might have sustained a "coup" injury, meaning a "contusion on the brain close to that side of the impact."

¶12         Military prosecutors charged Cardwell under the Uniform Code of Military Justice with three specifications of murder and one specification of manslaughter. In the court-martial proceedings, the military court granted Cardwell's motion to suppress the statements he made to law-enforcement officers during the three interviews, finding (1) the officers violated Article 31(b) of the military code, 10 U.S.C. § 831(b), at the May 19 interview, and (2) Cardwell's statements were involuntary. The military prosecutors then dismissed the charges without prejudice.

¶13         A Yuma County Grand Jury next indicted Cardwell on one count of second-degree murder, a class one felony. Before trial, Cardwell unsuccessfully moved to suppress the statements he gave in the interviews. During trial, the superior court (1) denied Cardwell's motion to dismiss based on a lack-of-jurisdiction claim; and (2) precluded him from calling two expert witnesses: John Weil, a retired Marine Colonel, and Randy Papetti, an attorney.

¶14         At trial, the State introduced the expert testimony of Dr. Carole Jenny, a practicing physician, professor of pediatrics, and director of a fellowship program specializing in child-abuse pediatrics. Based on her

review of the medical records, autopsy report, interviews, and a May 18 video of Cara, Dr. Jenny opined Cara "died of abusive head trauma," meaning "head trauma that occurs for infants and young children that is inflicted by another rather than an accident." Dr. Jenny said Cara suffered "a very severe fatal brain injury associated with multiple impact sites to her head" resulting from "severe blows." She noted Cara looked normal in the May 18 video. Dr. Jenny described the bruises on Cara's scalp as "new," caused by "direct impact to the skull," and in "very unusual places for kids to get accidental bruises." She confirmed Cara's facial burns matched bleach burns. And although Dr. Jenny independently reached her conclusions, she agreed with Dr. Hess's autopsy findings.

¶15        Cardwell's defense theory was that Cara sustained the fatal injuries from a short, accidental fall in her bedroom that night. And that Cara may have suffered from a bleeding disorder which contributed to her death. Cardwell called Dr. Evan Matshes, a physician and forensic pathologist, as an expert witness. Dr. Matshes agreed Cara "died of blunt head trauma" and explained "[t]he two possibilities are that it was intentional or that it was not intentional." He agreed Cara suffered "multiple blows to her head that showed up in the form of bruises across her scalp" and "a large fresh subdural hematoma." Dr. Matshes testified that "[s]ubdural hemorrhages can be the result of a short fall," but it "is a rare event" for a child to be "killed by a short fall." Dr. Matshes asserted Cara would have died within within 30 to 60 minutes after suffering the trauma.

¶16        Dr. Matshes determined the marks on Cara's face were chemical burns and they "occurred at or around the time of death." The burns could have been "sinister," but Dr. Matshes did not "rule out" the possibility that the burns were caused by Cara's own vomit. Nor did he exclude the possibility that "the deliberate act of someone throwing a caustic chemical" caused the burns.

¶17        Cardwell also called Dutch Johnson, a forensic biomechanical engineer specializing in "reconstructing injuries and deaths that are associated with criminal cases." Johnson explained that various studies showed children had died from short falls less than three feet. He offered no opinion on how Cara hit her head or how she died.

¶18        The jury found Cardwell guilty as charged. The jury also found that Cara was under 12 years old and that the State had proven two aggravating circumstances ("aggravators"): (1) Cara suffered physical and emotional harm, and (2) Cardwell was in a position of trust. The superior

court sentenced Cardwell to life imprisonment with the possibility of release after serving 35 years. Cardwell appealed, and we have jurisdiction under Article 6, Section 9, of the Arizona Constitution, A.R.S. §§ 13-4031, and -4033(A).

## DISCUSSION

### I. Separation of Powers

¶19 Cardwell contends the State's prosecution of his crime violated Arizona's separation-of-powers doctrine. In support, he cites a 2005 "Law Enforcement Agreement and Understanding" ("Agreement") between Yuma Base and Yuma County and City that authorized military authorities to investigate and prosecute serious felonies committed on the base, arguing the county attorney's prosecution invaded the military's jurisdiction. We review *de novo* whether "the State of Arizona has jurisdiction concurrent with the United States over federal lands situated within the State of Arizona." *State v. Galvan-Cardenas*, 165 Ariz. 399, 401 (App. 1990).

¶20 The State of Arizona generally has jurisdiction to prosecute crimes committed within its territorial borders. *State v. Vaughn*, 163 Ariz. 200, 203 (App. 1989); *see* A.R.S. § 13-108(A)(1). Once the State carries its "initial burden of proving that the offense occurred within this state[,]" the burden shifts to the defendant to prove the federal government possesses exclusive jurisdiction over the charged offense. *State v. Verdugo*, 183 Ariz. 135, 138 (App. 1995). "The federal government can acquire exclusive jurisdiction over state land in any one of three ways: (1) by purchase of land from a state, (2) by a cession of jurisdiction to the United States by a state after statehood, or (3) by an affirmation of exclusive jurisdiction to the United States prior to a state's admission to the Union." *Vaughn*, 163 Ariz. at 203. "The United States also acquires exclusive jurisdiction over land located within the boundaries of a state to which the United States holds title where there is a cession of jurisdiction by the state *and* an acceptance of jurisdiction by the United States." *Id.*

¶21 Cardwell first raised this argument when he moved to dismiss the indictment during trial, arguing there, as he does here, that the Agreement vested jurisdiction "solely and exclusively with the military courts-martial." In denying the motion, the superior court found that (1) the Agreement "cannot divest the State of Arizona" of jurisdiction and (2) even if "the Board of Supervisors could divest the State of Arizona of

jurisdiction[,] . . . [the Agreement] specifically includes a prosecution for this offense to be conducted by the county attorney's office."

¶22 Cardwell does not challenge the superior court's denial of his dismissal motion. Thus, he has waived any claim of error in that ruling. *See State v. Carver*, 160 Ariz. 167, 175 (1989) (abandoning and waiving unargued claims). This alone dooms his argument, given the court's finding that the Agreement authorized the county attorney's prosecution of his crime.

¶23 Even so, Cardwell has not shown exclusive federal jurisdiction. For the first time in the reply brief, Cardwell cites *State v. Willoughby*, 181 Ariz. 530 (1995), proposing that the State must prove jurisdictional facts beyond a reasonable doubt. Because this argument addresses points made in the State's answering brief, we will consider it. *See* Ariz. R. Crim. P. 31.10(c).

¶24 The defendant in *Willoughby* was convicted of premeditated first-degree murder and conspiracy to commit several felony offenses, including murder. 181 Ariz. at 532–33. The evidence presented a jurisdictional question because the defendant was "charged with an offense only part of which is alleged to have taken place in Arizona: the fatal blow and the death occurred in Mexico, and only acts of preparation allegedly took place in Arizona." *Id.* at 536. So "[t]o prosecute and convict Defendant for first-degree murder in Arizona, the state had to prove that acts of premeditation were committed in Arizona." *Id.*

¶25 The supreme court in *Willoughby* considered "who properly resolves jurisdictional facts in a criminal case and by what standard." *Id.* at 535. It concluded that, when jurisdictional facts are in conflict, "Arizona's territorial jurisdiction must be established beyond a reasonable doubt by the jury." *Id.* at 538. But when "the jurisdictional facts are undisputed, as in almost all cases, the court may decide the issue." *Id.* A defendant challenging jurisdiction must, therefore, first identify a conflict in jurisdictional facts before the burden shifts to the State to prove jurisdiction beyond a reasonable doubt to the jury. *See id.* at 538–39.

¶26 At trial, Cardwell did not present evidence of a factual conflict on the jurisdictional issue. Instead, he expressly conceded that the state and military prosecuting agencies had concurrent jurisdiction over his case. The superior court was therefore not required to submit the jurisdictional question to the jury.

¶27 Nor is there merit to Cardwell's claim that military and state prosecutors engaged in improper forum shopping. "Under the 'dual-

sovereignty' doctrine, a State may prosecute a defendant under state law even if the Federal Government has prosecuted him for the same conduct under a federal statute." *Gamble v. United States*, 139 S. Ct. 1960, 1964 (2019); *State v. Poland*, 132 Ariz. 269, 276 (1982) (same rule). And the county attorney's prosecution similarly did not constitute a "horizontal appeal." *See Powell-Cerkonery v. TCR Mont. Ranch Joint Venture, II*, 176 Ariz. 275, 278–79 (App. 1993) (improper horizontal appeals involve decisions of the same court and occur when a party unjustifiably seeks a second trial judge to reconsider the first trial judge's decision in the same matter). We find no separation-of-powers violation.

## II.        Autopsy Photograph

**¶28**        Cardwell next challenges the superior court's admission of "unduly gruesome" autopsy photographs of Cara's face. We review the court's ruling for abuse of discretion. *State v. Morris*, 215 Ariz. 324, 339, ¶ 69 (2007).

**¶29**        When determining whether the superior court erred in admitting photographs, reviewing courts consider the following factors: (1) "the photograph's relevance," (2) "its tendency to inflame the jury," and (3) "its probative value compared with its potential to cause unfair prejudice." *Id.*

**¶30**        A photograph "is relevant if it aids the jury in understanding any issue in dispute." *State v. Amaya-Ruiz*, 166 Ariz. 152, 170 (1990). Any photograph of a deceased victim in a murder case is relevant "because the fact and cause of death are always relevant in a murder prosecution." *State v. Anderson*, 210 Ariz. 327, 340, ¶ 39 (2005). Yet gruesome photographs may not be introduced solely to inflame the jurors. *State v. Gerlaugh*, 134 Ariz. 164, 169 (1982). Photographs of a deceased victim may be relevant to show the nature and location of an injury, show or explain testimony, corroborate the evidence, determine the degree of a crime, or support the State's theory of the case. *Anderson*, 210 Ariz. at 339–40, ¶ 39.

**¶31**        Here, the superior court denied Cardwell's motion to preclude a series of autopsy photographs depicting Cara's face, finding they were relevant and admissible to establish the events that occurred the night of Cara's death. Cardwell disputed both the cause and manner of Cara's death. The jury heard detailed testimony from medical experts about the nature of Cara's injuries and their likely causes. The autopsy photographs depicted her injuries and helped the jury evaluate the expert testimony in light of Cardwell's disputes. The court acknowledged—and

we agree—that the photographs were disturbing to look at and "prejudicial in a way." But we agree with the court that the potential for prejudice did not outweigh the photographs' probative value. We find no abuse of discretion.

### III.        Suppression Motions

**¶32**        Cardwell next argues the superior court should have excluded all statements he made to investigators during their interviews, claiming "three distinct legal avenues of analysis" required suppression: (1) analysis under military code Article 31; (2) application of collateral estoppel under *Crosby-Garbotz v. Fell*, 246 Ariz. 54 (2019); and (3) traditional voluntariness analysis. We address each argument in turn.

**¶33**        "We review the denial of a motion to suppress evidence for an abuse of discretion, considering only the evidence presented at the suppression hearing and viewing the facts in the light most favorable to sustaining the trial court's ruling." *State v. Wilson*, 237 Ariz. 296, 298, ¶ 7 (2015); *see also State v. Moran*, 232 Ariz. 528, 531, ¶ 5 (App. 2013) (deferring to the trial court on credibility findings). We review legal and constitutional issues *de novo*. *State v. Huerta*, 223 Ariz. 424, 426, ¶ 4 (App. 2010).

#### A.        Article 31 Argument

**¶34**        The military court's suppression ruling concluded that the Yuma detective should have given Cardwell an Article 31(b) warning at the May 19 interview. Because the detective failed to give an Article 31(b) warning at the May 19 interview, the military court found all of Cardwell's later statements involuntary. On appeal, Cardwell argues the superior court should have likewise suppressed his statements based on the same reasoning.

**¶35**        Article 31(b) provides "technical warning requirements similar to those prescribed in *Miranda*." *United States v. Steward*, 31 M.J. 259, 263 (C.M.A. 1990) (internal footnote omitted). "The protections of Article 31(b) are broader than *Miranda* warnings in that a suspect must receive warnings even if the suspect is not in custody." *United States v. Baird*, 851 F.2d 376, 383 (D.C. Cir. 1988); s*ee also United States v. Rogers*, 47 M.J. 135, 136 (C.A.A.F. 1997) (comparing Article 31(b) requirements with *Miranda*). Evidence obtained in violation of Article 31(b) is excluded from any "trial by court-martial." 10 U.S.C. § 831(d).

**¶36**        Federal courts have strictly construed Article 31 to apply *only* to evidence in court-martial trials and have refused to expand its reach to

civilian-court proceedings. *See United States v. Santiago*, 966 F. Supp. 2d 247, 258–59 (S.D.N.Y. 2013) (holding "Article 31 does not apply to a trial in a civilian court" and collecting cases). State courts have similarly refused to suppress evidence in civilian trials based on an Article 31(b) violation. *See* Maj. Michael J. Davidson, *The Effect of the Military's Article 31 Rights Warning Violations in Federal and State Courts*, 44 Fed. Law. 22, 24–26 (Aug. 1997) (collecting state court cases and observing that "the limited number of state courts to address this issue . . . have held that a violation of Article 31 does not require the suppression of a defendant's statements" in civilian trials).

¶37         Cardwell has identified no case in which a civilian court excluded evidence in a civilian trial based on a violation of Article 31. Rather, he contends the NCIS and Yuma police investigations "merged," citing two military court-martial cases: *United States v. Swift*, 38 C.M.R. 25 (1967) and *United States v. Grisham*, 16 C.M.R. 268 (1954). But neither *Swift* nor *Grisham* address the application of Article 31 protections in civilian proceedings. *See Swift*, 38 C.M.R. at 29–30; *Grisham*, 16 C.M.R. at 270–71. Article 31(b) does not require suppression here.

### B.    Collateral Estoppel

¶38         Cardwell next argues the superior court erred by denying his request to hold the State collaterally estopped from "relitigating" the military court's suppression ruling. We review his claim *de novo. Crosby-Garbotz*, 246 Ariz. at 56, ¶ 9.

¶39         Collateral estoppel does not apply to successive state and federal prosecutions because "the parties in the two cases are not the same." *United States v. Ricks*, 882 F.2d 885, 890 (4th Cir. 1989). "Collateral estoppel is an ingredient of the fifth amendment protection against double jeopardy," *State v. Nunez*, 167 Ariz. 272, 276 (1991), but double-jeopardy is not implicated when separate sovereigns prosecute a defendant for the same conduct. *See Gamble*, 139 S. Ct. at 1964; *Poland*, 132 Ariz. at 276. The superior court did not err.

### C.    Voluntariness

¶40         Finally, Cardwell argues his statements were involuntary because "there was inherent compulsion in the manner in which the interrogations were conducted." Cardwell relies on the language in the military court's suppression ruling, as though the superior court had no discretion to reach different conclusions than the military court. But the superior court "rendered [its suppression] decisions without knowing what happened in the court-martial case." In any case, we will not consider the

military court's ruling because it was not submitted as evidence at the suppression hearing. *See Wilson*, 237 Ariz. at 298, ¶ 7 ("considering only the evidence presented at the suppression hearing").

¶41        We review the admission of a defendant's statements to police for abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 126, ¶ 25 (2006). A finding of voluntariness "will be sustained absent clear and manifest error." *State v. Poyson*, 198 Ariz. 70, 75, ¶ 10 (2000).

¶42        "Only voluntary statements made to law enforcement officials are admissible at trial," and a "defendant's statement is presumed involuntary until the state meets its burden of proving that the statement was freely and voluntarily made and was not the product of coercion." *State v. Boggs*, 218 Ariz. 325, 335, ¶ 44 (2008). Statements are involuntary when there is "coercive police conduct" and a "causal relation between the coercive behavior and [the] defendant's overborne will." *Id.* at 336, ¶ 44. Courts examine the "totality of the circumstances surrounding the confession" to decide whether the defendant's will was overborne. *State v. Lopez*, 174 Ariz. 131, 137 (1992); *see also State v. Hatfield*, 173 Ariz. 124, 126 (App. 1992) (listing factors—including the accused's age and intelligence level, the length of detention, and whether the accused received a constitutional-rights advisory—to assess whether the accused's will was overborne).

¶43        Cardwell asserts his military status and training caused his will to be overborne. But the court rejected this assertion and partially denied Cardwell's motions after considering the conflicting evidence presented by the State and Cardwell during a four-day hearing. Nothing on this record overcomes our deference to the court's credibility determinations or its other factual findings. Nor does Cardwell's general assertion that the interviewers exploited his emotionally "fragile state" to render his statements involuntary. *See Hatfield*, 173 Ariz. at 126 ("In Arizona, confessions have been found to be voluntary notwithstanding the use of psychological tactics and interviewing techniques that play upon a defendant's sympathies."). And Cardwell's waiver of his rights at the May 22 and 26 interviews suggests that his statements were voluntary. *State v. Patterson*, 105 Ariz. 16, 17–18 (1969); *see also State v. Naranjo*, 234 Ariz. 233, 238, ¶ 7 (2014) ("A knowing and intelligent waiver of *Miranda* rights occurs when the suspect understands those rights and intends to waive them."). We find no abuse of discretion.

### IV.        Abusive-Head-Trauma Testimony

¶44        Cardwell next argues the superior court violated Arizona Rule of Evidence ("Rule") 704 by admitting, against objection, Dr. Jenny's testimony that the cause of Cara's death was "abusive head trauma." He argues Dr. Jenny's opinion constituted an impermissible legal conclusion. We review the admission of expert testimony for abuse of discretion. *State v. Bernstein*, 237 Ariz. 226, 228, ¶ 9 (2015).

¶45        An expert's testimony "is not objectionable just because it embraces an ultimate issue." Ariz. R. Evid. 704(a). Yet "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Ariz. R. Evid. 704(b). Under Arizona law, expert witnesses may testify that a child victim's injuries resulted from abuse. *See State v. Poehnelt*, 150 Ariz. 136, 150 (App. 1985) ("[e]xpert testimony to establish that injuries were intentional and not accidental [is] admissible").

¶46        Dr. Jenny did not improperly opine on Cardwell's guilt or *mens rea*; she testified that she had no opinion on who caused Cara's injuries. Her testimony thus merely suggested that "a child of tender years found with a certain type of injury has not suffered those injuries by accidental means, but rather is the victim of child abuse." *State v. Moyer*, 151 Ariz. 253, 255 (App. 1986). Such testimony is typically admissible because it is "not an opinion by a doctor as to whether any particular person has done anything." *Id.* For that reason, the admission of Dr. Jenny's abusive-head-trauma opinion did not violate Rule 704.

¶47        Cardwell also suggests Dr. Jenny's testimony should have been excluded under Rule 703 because her reports purportedly contained errors, she relied on unsworn statements, she did not personally speak with or interview any individual with firsthand knowledge of the case, and she exhibited no doubts about her cause-of-death opinion. But Cardwell fails to explain how any of his general complaints violate Rule 703, nor does he provide supporting authority for any such claims. Because Cardwell has not adequately developed his argument in a manner permitting review, he has waived his Rule 703 claim. *See State v. Thompson*, 252 Ariz. 279, 300, ¶ 84 (2022) (waiving undeveloped, conclusory arguments).

### V.        Preclusion of Defense Witnesses

¶48        Cardwell next asserts the superior court improperly precluded witnesses Weil and Papetti. We review such evidentiary rulings

for abuse of discretion, *Ellison*, 213 Ariz. at 29, ¶ 42, and will "affirm on any basis supported by the record." *State v. Wassenaar*, 215 Ariz. 565, 577, ¶ 50 (App. 2007).

### A.       Preclusion of Weil

**¶49**          More than a year before trial, Cardwell filed a notice of intent to present expert testimony from Col. John Weil, a retired Marine colonel and judge advocate general. The notice contained Weil's contact information but did not summarize his testimony or his qualifications. Cardwell did not provide any other information about Weil's proposed testimony or otherwise supplement his initial disclosure before trial.

**¶50**          During trial, the superior court held multiple hearings on whether to allow Weil's testimony. At the first hearing, Cardwell explained Weil would "testify to military culture and the issues surrounding [the] renewed motion for voluntariness." Finding the voluntariness issues had "already been litigated and been decided," the court precluded Weil from testifying on related topics. The court declined ruling on the rest of Weil's proposed testimony until it held an evidentiary hearing during which Weil could testify. At the evidentiary hearing, Weil recounted his experience in the Marine Corps and explained the purpose of his testimony was to assist the superior court in its voluntariness determination. The court precluded Weil's testimony, reasoning the proposed testimony "would be confusing to the jury and would confuse the issues as to voluntariness of the defendant's statements."

**¶51**          The superior court did not err by precluding Weil from testifying, given that his opinions merely addressed the admissibility of Cardwell's statements. *See* A.R.S. § 13-3988(A) (before a "confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness"). Because Weil could not help the jurors determine an issue of material fact, his testimony was not relevant. *See* Ariz. R. Evid. 702 (permitting expert-opinion testimony when it "will help the trier of fact to understand the evidence or to determine a fact in issue").

### B.       Preclusion of Papetti

**¶52**          Two months before trial, Cardwell disclosed his intent to call Papetti as an expert witness. A few weeks later, the State objected to relevancy of Papetti's testimony and claimed Cardwell had not responded to the State's requests for its scope, Papetti's CV, and his written reports. Cardwell eventually disclosed Papetti's CV and a general summary of his

proposed testimony several days after trial began but did not provide his opinions.

**¶53** During trial, the superior court addressed the State's objection. The prosecutor argued preclusion was appropriate because Cardwell ignored multiple requests to disclose Papetti's testimony. Cardwell countered there was "no discovery issue" and asserted Papetti should be allowed to "testify as to legal and medical conclusions." The court sanctioned Cardwell's disclosure violation by precluding Papetti.

**¶54** Defendants must disclose the names of all potential trial witnesses no later than 40 days after arraignment or within 10 days after the State's disclosure, whichever occurs first. Ariz. R. Crim. P. 15.2(d)(1). For experts who do not prepare a written report, defendants must also disclose a "summary of the general subject matter and opinions on which the expert is expected to testify[.]" Ariz. R. Crim. P. 15.2(c)(2)(C). Arizona Rule of Criminal Procedure 15.7 authorizes courts to sanction parties for disclosure violations, including the failure to timely disclose witnesses. *Naranjo*, 234 Ariz. at 242, ¶ 30.

**¶55** A sanction must be proportional to the disclosure violation, *State v. Payne*, 233 Ariz. 484, 518, ¶ 155 (2013), and preclusion should be imposed only when less stringent sanctions do not accomplish the "ends of justice." *State v. Smith*, 123 Ariz. 243, 252 (1979). Before precluding a witness, courts must consider: "(1) how vital the precluded witness is to the proponent's case; (2) whether the witness's testimony will surprise or prejudice the opposing party; (3) whether bad faith or willfulness motivated the discovery violation; and (4) any other relevant circumstances." *Naranjo*, 234 Ariz. at 242, ¶ 30 (citation omitted). Preclusion is permissible "when a party engages in willful misconduct, such as an unexplained failure to do what the rules require." *Id.* at 242, ¶ 34 (citation omitted).

**¶56** Cardwell's failure to properly disclose Papetti warranted imposing a sanction. And Cardwell has not shown Papetti was vital to his case, given that he does not articulate any specific testimony he sought to elicit from Papetti. *Id.* at 242, ¶ 30. If Cardwell sought to elicit legal-causation conclusions from Papetti, such testimony is inadmissible. *See State v. Sosnowicz*, 229 Ariz. 90, 97, ¶ 25 (App. 2012). Cardwell's late and incomplete disclosure, after trial had started, prejudiced the State. *See Naranjo*, 234 Ariz. at 242, ¶ 30; *Wells v. Fell*, 231 Ariz. 525, 528, ¶ 13 (App. 2013) ("The underlying principle of disclosure rules is the avoidance of undue delay or surprise.") (cleaned up). And even assuming Cardwell did

not act in bad faith, he gives no explanation for his dilatory conduct. The court did not abuse its discretion in precluding Papetti.

## VI.        Evidentiary Rulings

¶57        Cardwell also asserts the superior court violated Rule 404(b) by admitting propensity evidence: (1) Cardwell's written statements in a notebook; (2) testimony recounting Cardwell's criticism of Barbara's parenting approach; (3) testimony about an incident when Cardwell punched a wall while arguing with Barbara; and (4) testimony that Cara "ran away from [Cardwell] when he would go to pick her up." We review evidentiary rulings for abuse of discretion. *Ellison*, 213 Ariz. at 129, ¶ 42.

### A.        Notebook Entry

¶58        Soon after getting married, Cardwell and Barbara began disagreeing over parenting styles and how to discipline Cara. To improve their communications, Cardwell bought a notebook in which they would write to one another about those issues and other marital matters.

¶59        At trial, over Cardwell's relevance objection, the superior court admitted one of his notebook entries. But contrary to Cardwell's assertion, the superior court admitted his written statements as an opposing party's statement under Rule 801(d)(2). And on appeal, Cardwell does not challenge the Rule 801(d)(2) ruling, thereby waiving that issue. *See Carver*, 160 Ariz. at 175. We find no error.

### B.        Criticism of Barbara

¶60        During an exchange about Cardwell's criticisms of her parenting Barbara testified:

> Q: But do you remember around what times, like what events that -- that he made those comments?
>
> A: Sometimes when he would come home, she would see him and run towards me and she would just want me to hold her, so I would hold her and I'd play with her and he would be like you baby her too much.

¶61        Cardwell did not object at the time, but now protests this testimony. We review for fundamental error only. *State v. Escalante*, 245 Ariz. 135, 140, ¶ 12 (2018). Cardwell never explains how the admission of the brief, vague comments during several weeks of trial testimony

amounted to fundamental, prejudicial error. *See Ellison*, 213 Ariz. at 133, ¶ 62 (rejecting fundamental-error claim when the challenged testimony was brief and not relied on in closing argument); *see also State v. Cruz*, 218 Ariz. 149, 166, ¶ 102 (2008) (finding defendant "failed to show that the snippet of [other-act] testimony rendered his trial fundamentally unfair"). And the testimony was cumulative to Cardwell's statements that Barbara was an overprotective mother who did not discipline Cara sufficiently. *See State v. Moody*, 208 Ariz. 424, 455, ¶ 121 (2004) (no fundamental error when the challenged evidence was cumulative to other properly admitted evidence).

### C. Wall-Punching Incident

**¶62** Before trial, the superior court denied the State's Rule 404(b) request to introduce testimony that Cardwell had "punched a hole in the wall during an argument" with Barbara. The State complied with the court's order on direct examination of Barbara. On cross-examination, defense counsel's questioning suggested that Cardwell would merely "stop talking" during arguments and he had never "laid hands" on her even though she had "pushed him a few times." The prosecutor then argued the defense had opened the door to the wall-punching incident. The superior court agreed and permitted the State to introduce rebuttal testimony from Barbara about Cardwell's wall-punching act.

**¶63** On appeal, Cardwell does not argue the superior court erred by finding he had opened the door to the wall-punching incident's admission as rebuttal evidence. Having abandoned any such challenge, his claim fails. *See Carver*, 160 Ariz. at 175.

### D. Cara's Behavior

**¶64** Cardwell next challenges the admission of evidence that Cara would run away from him when he tried to pick her up. He supports his claim with two record citations, but those citations refer us only to the superior court's preliminary rulings on the admissibility of the proposed testimony. Because he identifies neither the challenged testimony's content nor where the statements were ultimately admitted into evidence, his argument is waived. *See Carver*, 160 Ariz. at 175; *cf. Ramirez v. Health Partners of S. Ariz.*, 193 Ariz. 325, 326, ¶ 2 n.2 (App. 1998) ("Judges are not like pigs, hunting for truffles buried in [the record.]") (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

### E.      Limiting Instruction

¶65      Finally, Cardwell complains the superior court erroneously denied his request to give the jurors an other-act limiting instruction. *See* RAJI (Criminal) Stand. 24 (5th ed. 2019). But the court did not have to give such an instruction because no other-act evidence was admitted under Rule 404(b). *Cf. State v. Ferrero*, 229 Ariz. 239, 244, ¶ 23 (2012) (courts must grant a request to give a limiting instruction when other-act evidence has been admitted).

## VII.      Alleged Sentencing Errors

¶66      Cardwell challenges his sentence on two grounds, asserting the superior court (1) considered an improper aggravator in imposing his sentence, and (2) violated *Blakely v. Washington*, 542 U.S. 296 (2004) by sentencing him without the necessary specific jury finding. Because Cardwell did not object on these grounds in the superior court, he has forfeited review absent fundamental, prejudicial error. *Escalante*, 245 Ariz. at 140, ¶ 12.

### A.      Asserted Improper Aggravator

¶67      Cardwell argues the superior court unlawfully considered the harm-to-the-victim aggravator because it was an element of his conviction, and the State may not use an element of the crime as an aggravating factor. But he relies on two provisions—§§ 13-701(D)(1) and -701(D)(2)—that the State did not rely on. The State noticed, and the jury found, the harm-to-the-victim aggravator under § 13-701(D)(9).

¶68      And Cardwell is incorrect that the maximum possible sentence he faced was 20 years. The legislature has identified certain "dangerous crimes against children" and set forth sentencing provisions for such crimes. As relevant here, "[A] person who is at least eighteen years of age . . . who is convicted of . . . second degree murder of a minor who is under twelve years of age, may be sentenced to life imprisonment." A.R.S. § 13-705(C). The jury convicted Cardwell of second-degree murder against a victim younger than twelve. The court did not need to rely on an aggravator to impose a life sentence on Cardwell.

### B.      Blakely Claim

¶69      Lastly, Cardwell argues the superior court improperly enhanced his sentence as a dangerous crime against children because the jury did not determine whether his conduct focused on Cara. "Other than

the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). The statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose based solely on the facts reflected in the verdict or admitted by the defendant *Blakely*, 542 U.S. at 301–03.

¶70 Cardwell did not raise this issue in the superior court, so we review for fundamental error. *Escalante*, 245 Ariz. at 140, ¶ 12. Even if the absence of a specific, separate jury finding on this point constitutes fundamental error, his claim still fails because he does not assert any resulting prejudice. *See State v. Thompson*, 252 Ariz. 279, ¶ 58 (2022) (rejecting a fundamental error challenge, when a defendant failed to articulate how such error prejudiced him because the defendant bears the burden of establishing such prejudice).

## CONCLUSION

¶71 We affirm Cardwell's conviction and sentence.



AMY M. WOOD • Clerk of the Court
FILED: AA